645 A.2d 677

IN THE MATTER OF WILLIAM LIMONGELLI, D.D.S.,
PETITIONER–RESPONDENT, v. NEW JERSEY STATE
BOARD OF DENTISTRY, RESPONDENT–APPELLANT.

Argued September 13, 1993—Decided December 16, 1993.

318

*Anne Marie Kelly,* Deputy Attorney General, argued the cause for appellant (*Fred DeVesa,* Acting Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Patrick T. Collins* argued the cause for respondent (*Franzblau, Dratch,* attorneys; *Stephen N. Dratch,* of counsel; *Patrice M. Renner,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This case poses two questions. First, must the New Jersey Board of Dentistry (Board) provide to a dentist who is applying to have a license reinstated notice of and an opportunity to meet

charges of misconduct that occurred during the period of revocation before the Board imposes an additional period of disqualification from practice? Second, does the New Jersey Professional Service Corporation Act, *N.J.S.A.* 14A:17–1 to –18, require a dentist whose license to practice has been revoked to surrender ownership of all shares in any professional corporation engaged in the practice of dentistry? We answer both questions affirmatively and direct that the Board reconsider Dr. Limongelli's application in accordance with this opinion.

I

On January 9, 1986, Dr. William Limongelli signed a consent order revoking his license to practice dentistry. The order provided that Limongelli would be prohibited from applying for reinstatement for five years. The revocation resulted from Dr. Limongelli's plea of guilty to several counts of theft by deception through the submission of fraudulent insurance claims.

In 1989, informed that the consent order might have been violated, the Board conducted an investigation to determine whether Dr. Limongelli was practicing dentistry without a license. In the course of that investigation, Dr. Anthony Vitale, an associate of Dr. Limongelli, testified before the Board on February 15, 1989. Limongelli was not present at that hearing because the Board did not then notify him either of its investigation or that Vitale would testify. Later, on March 29, 1989, the Board questioned Limongelli in three areas. At that time, the Board informed Limongelli that it would advise him of its findings. Not until Dr. Limongelli applied for reinstatement in 1991, however, did the Board take action. In connection with that application, the Board found that Limongelli had practiced while his license was revoked by failing to divest himself of financial interests in professional dental services corporations. The Board denied Limongelli's application for relicensure and prohibited him from reapplying for an additional ten years.

Prior to the revocation of his dental license in 1986, Dr. Limongelli had been the sole shareholder in two professional corporations, the Dental Parkway Clinic, Inc. and the Orange Dental Center, P.C. Those corporations operated Medicaid practices in Newark and Orange, respectively. The clinics occupied office space in buildings personally owned by Limongelli. Limongelli also shared a practice with Vitale; although that practice was the subject of investigation, it did not form a basis for the Board's discipline of Limongelli.

The Board found that Dr. Limongelli had violated the 1986 revocation of his dental license by retaining interests in his two clinics in Newark and Orange. During the Board's investigation, Limongelli's testimony conflicted with that of Dr. Vitale. According to Limongelli, he began negotiations with Vitale concerning transfer of the two practices in October 1985, prior to the signing of the consent order. However, Vitale told the Board that he did not even know that Limongelli's license to practice had been revoked until August 1986, much less that he had acquired Limongelli's two practices at an earlier date. Certificates changing the registered agent for the two corporations from Limongelli to Vitale were filed on October 7, 1985. Although he admitted that no money had changed hands, Limongelli claimed that his attorney had informed him that the filing of the certificates was sufficient to transfer ownership of the two clinics. As far as Limongelli was concerned, Vitale agreed to run the clinics until an actual buy-out was executed. No such buy-out ever occurred.

However, not only did Dr. Vitale fail to purchase the two clinics, he did not even participate in their management in any significant manner. The most significant administrative task that he performed was the signing of checks for the clinics. Dr. Vitale did not draw any salary or receive any other compensation from the clinics in exchange for his minimal services. In contrast, Dr. Limongelli admitted that even though his license to practice dentistry had been revoked on January 9, 1986, he had continued to participate in the administration and management of the clinics.

For example, he hired a dentist for one of the clinics in April 1986, remained involved in the payroll administration of both clinics as late as September 1987, and continued to do all of the administrative work for the Orange Dental Center well into 1987.

Because Dr. Vitale never followed through in purchasing the two clinics and terminated all association with those practices in 1988, Dr. Limongelli leased the clinics to Dr. Joseph Prasad beginning on January 1, 1989. Limongelli claimed that Dr. Prasad owned the buildings and the dental equipment under the leases. The Board concluded, however, that Dr. Limongelli had retained a beneficial interest in the office equipment and the practices themselves, merely permitting Dr. Prasad to operate the practices during the period of Limongelli's disqualification. For example, the leases for the two clinics, which were written by Limongelli, included provisions giving Prasad ownership of the equipment, instruments, supplies, and patient records only for the term of the lease and requiring Prasad to return all property to Limongelli undamaged at the termination of the lease. Furthermore, the leases gave Dr. Prasad the option to purchase a one-half interest in the clinics. From whom Dr. Prasad would have purchased that one-half interest is not clear because Dr. Limongelli claimed that Prasad already owned the clinics outright under the leases.

Finally, Dr. Limongelli listed all shares of both dental clinics, inclusive of equipment, as personal assets in a petition filed in a February 1989 Chapter 13 bankruptcy proceeding captioned "In re William Alfonso Limongelli d/b/a Orange Dental Center."

In short, the Board found that both Limongelli's proposed sale of his clinics to Vitale and his lease of the clinics to Prasad were mere paper transactions rather than divestitures.

## II

The foregoing facts led the Board to conclude that Limongelli had practiced dentistry after his license had been revoked. The Board's response to those violations was to extend by ten years

the period during which Dr. Limongelli could not apply for reinstatement. Dr. Limongelli appealed the Board's action to the Appellate Division.

The Appellate Division held that the Board had denied Limongelli due process because it had not given him notice of and an opportunity to respond to the Board's charge that he had violated the consent order by maintaining financial interests in professional corporations engaged in the practice of dentistry. 260 *N.J.Super.* 346, 616 *A.*2d 945 (1992). The court found that Limongelli's license had been suspended rather than revoked because Limongelli could apply for relicensure after five years. *Id.* at 355, 616 *A.*2d 945. As a result, the court held that Limongelli had a constitutionally-protected property right in his "suspended" license. *Ibid.* Because that constitutionally-protected property interest could not be abrogated except by due process of law, Limongelli's application for relicensure had to be deemed a "contested case" under the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –21. Thus, Limongelli would be entitled to the procedures that the APA requires in contested cases. 260 *N.J.Super.* at 356, 616 *A.*2d 945. The Appellate Division also held that Dr. Limongelli had not violated the Professional Service Corporation Act by maintaining sole ownership of the Newark and Orange clinics. *Id.* at 357–58, 616 *A.*2d 945. We granted the Board's petition for certification, 133 *N.J.* 434, 627 *A.*2d 1140 (1993).

Although we agree that fundamental fairness requires the Board to provide Dr. Limongelli with adequate notice of the charges against him and an opportunity to respond to those charges, we disagree with the Appellate Division's holding that this was a "contested case" within the meaning of the APA. Because administrative due process requires agencies at a minimum to provide parties with adequate notice, a chance to examine opposing evidence, and the opportunity to present evidence and argument in response before imposing substantial sanctions, we agree with the Appellate Division that a remand is required.

We also find that the Professional Service Corporation Act, when read in conjunction with the statutes governing the practice of dentistry, *N.J.S.A.* 45:6–1 to –69, bars a dentist who has been disqualified from practice from owning shares in any professional corporation that engages in the practice of dentistry or owning any dental equipment employed in the performance of dental procedures.

## III

### A.

The APA requires that all parties to "contested cases" be provided with notice and a hearing, at which they may present evidence and argument prior to resolution of such cases. *N.J.S.A.* 52:14B–9. With limited exceptions, those hearings must be conducted before an Administrative Law Judge (ALJ). *See N.J.S.A.* 52:14F–8. *N.J.S.A.* 52:14B–2(b) defines a "contested case" as

a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing * * *.

Under that definition of "contested case," notice and an ALJ hearing are required under the APA only when a hearing is required under (1) the United States Constitution, (2) the New Jersey Constitution, or (3) another New Jersey statute. As the Appellate Division has observed,

the [Administrative Procedure] Act itself does not create a substantive right to an administrative hearing. Rather, the Act provides for a procedure to be followed "in the event an administrative hearing is otherwise required by statutory law or constitutional mandate."

[*Valdes v. New Jersey State Bd. of Medical Examiners,* 205 *N.J.Super.* 398, 404 [501 A.2d 166] (1985) (quoting *Application of Modern Indus. Waste Serv.,* 153 *N.J.Super.* 232, 237 [379 A.2d 476] (App.Div.1977)).]

No statute requires that a disqualified dentist receive a hearing in an application for relicensure. Whether "constitutional mandate" requires a hearing depends on the nature of the interest involved and the expectations of the party. Courts have long

since "fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights." *Board of Regents v. Roth*, 408 *U.S.* 564, 571, 92 *S.Ct.* 2701, 2706, 33 *L.Ed.*2d 548, 557 (1972) (footnote omitted). The question now is not whether a benefit is a "right" or "privilege" but rather whether a person has already acquired interests in specific benefits. *Id.* at 576, 92 *S.Ct.* at 2708, 33 *L.Ed.*2d at 560.

New Jersey courts have long equated occupational licenses with property rights. *In re Polk License Revocation*, 90 *N.J.* 550, 562, 449 *A.*2d 7 (1982); *Lane Distrib., Inc. v. Tilton*, 7 *N.J.* 349, 362, 81 *A.*2d 786 (1951); *Kravis v. Hock*, 136 *N.J.L.* 161, 164, 54 *A.*2d 778 (E. & A.1947); *Schireson v. State Bd. of Medical Examiners*, 130 *N.J.L.* 570, 575, 33 *A.*2d 911 (E. & A.1943). However, "[a] protected property right comes into existence only after a license has been obtained." *Valdes, supra*, 205 *N.J.Super.* at 405, 501 *A.*2d 166 (denying Georgia-licensed doctor right to hearing when he was refused New Jersey license because doctor had mere expectation of New Jersey license as property interest). Thus, constitutional due process protects against only the improper suspension or revocation of a license; it does not protect against a licensing board's summary refusal to reinstate a license that has been revoked. *Graham v. New Jersey Real Estate Comm'n*, 217 *N.J.Super.* 130, 524 *A.*2d 1321 (App.Div.1987) (refusing to find right to hearing for real estate agent denied relicensure after allowing license to lapse).

Dr. Limongelli claims that the *Graham* rule does not apply to him because his license was merely suspended, not revoked. He relies on the distinction made between suspension and revocation of a professional license in two recent Pennsylvania cases. In *Brown v. State Board of Pharmacy*, 129 *Pa.Cmwlth.* 642, 566 *A.*2d 913 (1989), the court held that a pharmacist whose license had been suspended had a constitutionally-protected property interest because the license had been merely suspended rather than revoked. The court defined the distinction between "suspension"

and "revocation" as the difference between a temporary depriva-
tion and a permanent extinguishment. *Id.* 566 *A.*2d at 915.
Using the same logic, the same Pennsylvania court held in *Pitten-
ger v. Department of State,* 142 *Pa.Cmwlth.* 57, 596 *A.*2d 1227
(1991), that a doctor whose license had been revoked had no
constitutionally-protected property interest.

Just as the rights/privileges analysis did not provide a lasting
solution to constitutional-due-process issues, we expect that a
distinction between a revoked professional license and a suspend-
ed license may not answer all questions. Under *N.J.S.A.* 45:6–7, a
revoked dentist "may, in the discretion of the board, be relicensed
at any time to practice without an examination upon application to
the board." In Dr. Limongelli's case, the Board exercised its
discretion to prohibit application for relicensure for five years. A
revoked licensee who may apply for relicensure sounds like a
suspended licensee, unless of course the agency requires an
entirely new set of licensing examinations. We think that the
distinction is better drawn in terms of what expectations the
applicant has in the relicensure process. As the United State
Supreme Court has explained, "[t]o have a property interest in a
benefit, a person clearly must have more than an abstract need or
desire for it. He must have more than a unilateral expectation of
it. He must, instead, have a legitimate claim of entitlement to it."
*Roth, supra,* 408 *U.S.* at 577, 92 *S.Ct.* at 2709, 33 *L.Ed.*2d at 561.
The Court explained further that such property interests "are
defined by existing rules or understandings that stem from an
independent source such as state law—rules or understandings
that secure certain benefits and that support claims of entitlement
to those benefits." *Ibid.* Although some similarity exists between
the position of a revoked licensee who may apply for reinstate-
ment and that of a suspended licensee, we are satisfied that a
professional whose license has been revoked indefinitely for crimi-
nal misconduct does not have the same "legitimate claim of
entitlement" as one whose license has been suspended for thirty
days as a result of a record-keeping violation.

Thus, because a dentist whose license has been revoked under such circumstances has no constitutionally-cognizable property interest, Dr. Limongelli has no right to an ALJ hearing under the APA in connection with his application for relicensure.

### B.

Notwithstanding the absence of a constitutional or a statutory right to an ALJ hearing under the APA, procedural fairness required the Board to (1) inform Limongelli that it was considering extending the period during which he would be prohibited from applying for relicensure, and (2) provide Limongelli with an opportunity to meet and respond to any allegations of wrongdoing.

Basic procedural fairness has always been a cornerstone of administrative law in this State: "The right to a hearing before a governmental agency, whose proposed action will affect the rights, duties, powers or privileges of, and is directed at, a specific person, has long been imbedded in our jurisprudence." *Cunningham v. New Jersey Dep't of Civil Serv.*, 69 *N.J.* 13, 19, 350 *A.*2d 58 (1975). Thus, when an executive agency takes action against a person, procedural fairness will often require that the agency grant that person a hearing. This Court explained what that hearing entails in *High Horizons Development Co. v. New Jersey Department of Transportation*, 120 *N.J.* 40, 575 *A.*2d 1360 (1990): "Certainly, included among the elements of procedural fairness is a chance to know the opposing evidence and argument and to present evidence and argument in response." *Id.* at 53, 575 *A.*2d 1360. In short, an agency "determination cannot rest upon undisclosed evidence which the parties have had no opportunity to test for trustworthiness or to explain or rebut." *Brotherhood of R.R. Trainmen v. Palmer*, 47 *N.J.* 482, 487, 221 *A.*2d 721 (1966).

Dr. Limongelli had the right to know that the Board was contemplating extending the period during which he would be prohibited from applying for relicensure. Furthermore, Limongelli also had the right to respond to the Board's charges that he had continued to practice dentistry after his license had been

revoked. Dr. Limongelli did not know of the 1989 allegations made against him by Dr. Vitale until two years later, when the Board finally acted on Vitale's testimony by extending the period during which Limongelli was prohibited from applying for relicensure for ten years. The Board asserts that Limongelli's notice was its decision, and that Limongelli had the opportunity to respond by petitioning for a rehearing. These circumstances are an inadequate substitute for a fair hearing in the first instance.

█ The needs of the case will determine the type of hearing required on remand. The Board insists that no credibility issues exist that would require cross-examination of witnesses. But Dr. Limongelli insists that Dr. Vitale may have given but a one-sided view of the status of their negotiations; Dr. Vitale may have shaded his testimony out of concern that he himself may have been a target of the Board. When an administrative determination may have profound consequences, such as the effective loss of a professional license, administrative due process requires that the one affected by opposing testimonial evidence have the opportunity to cross-examine the witness. *See Board of Educ. v. Cooperman*, 105 *N.J.* 587, 600–01, 523 *A.*2d 655 (1987) (holding that agency should allow cross-examination when issues in dispute are highly fact-sensitive).

█ Thus, we concur in the Appellate Division's determination that this case be remanded to the Board for further proceedings. Because we base our decision on principles of administrative law rather than the constitutional or statutory right to an administrative hearing in "contested cases" conferred by the APA, we do not require the Board to hold an ALJ hearing. However, the Board "must tailor the procedure to ensure due process and may allow cross-examination of its [witnesses] to satisfy that requirement." *High Horizons Dev. Co., supra*, 120 *N.J.* at 54, 575 *A.*2d 1360.

## IV

Because we are remanding this case for further proceedings before the Board, we address the question of whether a dentist

whose license has been revoked may continue to own shares in a professional dental corporation or assets that are used in the practice of dentistry.

The Professional Service Corporation Act, which allows certain licensed professionals to practice in corporate form, includes three provisions regarding the consequences of the disqualification of shareholders to engage in the licensed practice. *N.J.S.A.* 14A:17–13(c) provides that when a professional-corporation shareholder becomes disqualified from practicing, that shareholder must divest himself or herself of all shares in the corporation within ninety days of that disqualification. *N.J.S.A.* 14A:17–13(b) declares that when all the shareholders of a professional corporation become disqualified to own such shares, the professional corporation is converted into a business corporation that cannot perform professional services. Finally, *N.J.S.A.* 14A:17–11 requires any disqualified professional corporation shareholder to sever all employment with the corporation and to stop receiving any profits from the corporation's professional services.

The Appellate Division believed that *N.J.S.A.* 14A:17–13(c) and –13(b) were mutually exclusive alternatives, the former applying to multi-shareholder professional corporations and the latter to single-shareholder professional corporations. Because Dr. Limongelli was the sole shareholder of the Newark and Orange clinics, the panel below held that only *N.J.S.A.* 14A:17–13(b) applied to this case and did not require divestiture. Although the statute is not a model of clarity, we are inclined to agree with the Board's interpretation of the Professional Service Corporation Act, which finds the divestiture provision and business corporation transformation provision to be complementary rather than mutually exclusive. "It is a fundamental maxim that the opinion as to the construction of a regulatory statute of the expert administrative agency charged with the enforcement of that statute is entitled to great weight * * *." *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 575, 384 *A.2d* 795 (1978).

Once a dentist who is a shareholder in a professional corporation has been "disqualified" from practice, at least two and possibly three consequences for the practice arise. First, pursuant to *N.J.S.A.* 14A:17–13(c), the disqualified dentist must transfer all professional corporation shares to a duly licensed practitioner within ninety days of the date of disqualification. Second, the dentist must sever all employment with the corporation and terminate receipt of any financial benefits from the corporation as a shareholder pursuant to *N.J.S.A.* 14A:17–11. Finally, if the disqualified dentist was the sole shareholder of the professional corporation, *N.J.S.A.* 14A:17–13(b) requires that the professional corporation be converted into a normal business corporation, which cannot engage in the practice of dentistry. (*N.J.S.A.* 45:6–12 prohibits the corporate practice of dentistry. Presumably, the Professional Service Corporation Act, when read in conjunction with *N.J.S.A.* 45:6–12, which was passed prior to the Professional Service Corporation Act, means that only professional corporations, not regular business corporations, can perform professional dental services.) The net result of that statutory framework is to prohibit a dentist whose license has been suspended or revoked from receiving profits as either a shareholder or an employee of a professional corporation engaged in the practice of dentistry. Under the absolute language of *N.J.S.A.* 14A:17–11 ("sever *all* employment" (emphasis added)), a disqualified dentist presumably could not even be employed by a dental corporation as an office administrator, secretary, or receptionist.

Furthermore, *N.J.S.A.* 45:6–19 states that "[a]ny person shall be regarded as practicing dentistry within the meaning of this chapter who * * * [r]etains the ownership or control of dental material, equipment or office and makes the same available in any manner for the use by operators, assistants or other agents * * *." Thus, under a strict reading of the statute, any dentist who has been disqualified from practicing dentistry must terminate all ownership of dental material, equipment, and offices,

including all shareholder interests in professional dental corporations.

As noted, the relevant sections of the Professional Service Corporation Act use the broad term "disqualification," not the narrow term "revocation." Thus, the Act might require even suspended dentists to divest themselves of their professional dental corporation shares. Similarly, because *N.J.S.A.* 45:6–19 includes in its definition of the practice of dentistry the ownership of dental assets, any suspension from the practice of dentistry might technically require the suspended practitioner to divest himself or herself of all dental assets. At oral argument, the Board indicated that it generally allows dentists who have been suspended to continue to own dental corporation shares and dental assets, so long as such suspended dentists do not perform dental procedures themselves or profit from the performance of dental procedures by others. The problem is that the statute governing dentistry allows practitioners whose licenses have been revoked to apply for relicensure at any time. *N.J.S.A.* 45:6–7. Does that mean that every disqualified dentist is merely a "suspended" dentist? The Board informs us that it characterizes as suspensions only disqualifications for ninety days or less.

We agree that the Board is probably correct to exercise its discretion to exempt dentists disqualified for ninety days or less from the divestiture requirement. Besides, the statute allows a ninety-day grace period for divestiture. To require a suspended professional to sell all professional shares and assets would be both illogical and unfair in many instances even were the suspension to exceed ninety days. Technically, any disqualified professional is required to dispose of professional shares within ninety days. However, we think that the Legislature did not intend to place such a severe burden on professionals suspended for a relatively brief period of time; rather it intended to prohibit only contact with clients and profit from the practice in the case of suspended professionals. Thus, we agree with the informal policy of the Board regarding suspended dentists. However, because, to

our knowledge, that informal policy of the Board is not embodied in any regulation or manual, to apply the statute literally to one such as Limongelli when it is not applied that way to others may be unfair. When an agency intends to enforce by adjudication a standard of conduct inferable from a statutory mandate, fairness demands that the standard be stated before the agency "rule[s] in a particular case." *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 155, 183 *A.*2d 64 (1962). We need not debate whether the standard need be developed through rulemaking, although that would surely be preferable and fairer to all. The standard may be "clearly and obviously inferable from the enabling statutory authorization," *Metromedia, Inc. v. Director, Division of Taxation,* 97 *N.J.* 313, 331, 478 *A.*2d 742 (1984), and thus be established by administrative order or guideline. The point is that statement of the standard should precede adjudication thereunder. We note that in some instances the Board's orders have specifically required divestiture.

Whether Dr. Limongelli fully appreciated that his failure to divest placed his return to practice in jeopardy appears questionable. He may have assumed that he did not have to divest himself of his professional corporations and his dental assets, so long as he did not actually perform dental procedures or profit from the performance of dental procedures by others. Consequently, if after conducting the remand proceedings the Board finds Dr. Limongelli guilty of failing to divest himself of his financial interests in the dental corporations at issue in this case, the severity of any sanction imposed on Dr. Limongelli should be weighed in light of the prospective notice that the Board has afforded to dental practitioners. Dr. Limongelli has been suspended now for almost eight years.

The judgment of the Appellate Division is affirmed and the case is remanded to the Board of Dentistry for further proceedings consistent with this opinion.

334

*For affirmance and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—7.

*Opposed*—None.