759 A.2d 894 (2000)
334 N.J. Super. 400
LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,
v.
Cimmie HYMAN, Siata Davis Lydia Franklin, Kathy Franklin, Rhonda Williams, Easton Chiropractic Associates, Inc., Powers Street Ortho Rehab Center, P.A., Kavita Sinha, M.D., Nicola Chiropractic Center, P.A., Spinal and Head Trauma P.C., and Brunswick Imaging Center, Inc., Defendants.
Superior Court of New Jersey, Law Division, Morris County.
Decided June 26, 2000.
*895 Thomas O. Mulvihill, Parsippany, for plaintiff (Maloney and Katzman, attorneys).
No one appeared for defendants.
VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
Plaintiff, Liberty Mutual Insurance Company ("Liberty Mutual"), filed suit seeking a declaration that, in part, it is not obligated to provide defendant Easton Chiropractic Associates, Inc. ("Easton") with personal injury protection ("PIP") benefits for services rendered to defendants Rhonda Williams, Cimmie Hyman, Kathy Franklin, Siata Davis and Lydia Franklin since Easton, a general business corporation, was engaged in the improper practice of rendering chiropractic services without a license and violated the Professional Service Corporation Act, N.J.S.A. 14A:17-1 to -18. Easton has not filed an answer to the complaint, and a default has been entered. Liberty Mutual now moves for the entry of a default judgment against Easton.
Liberty Mutual also seeks an order of partial summary judgment declaring that it is not obligated to provide Cimmie Hyman or Siata Davis with PIP and/or uninsured motorist ("UM") benefits on the basis that they knowingly made material misrepresentations of fact to Liberty Mutual during the course of its investigation of their claims, thereby voiding their entitlement to coverage.

I.
Liberty Mutual issued a policy of automobile insurance to Cimmie Hyman. In accordance with the laws of the State of New Jersey, this policy provided for the payment of PIP and UM benefits.
On or about September 28, 1998, Liberty Mutual received notice from its insured, Cimmie Hyman, that she had been involved in a hit-and-run automobile accident in Newark, New Jersey. During the course of her initial report, Cimmie Hyman advised Liberty Mutual that the only passengers in her vehicle at the time of the *896 accident were Lydia Franklin and Kathy Franklin.
Liberty Mutual ultimately received claims for PIP and UM benefits from Cimmie Hyman, Lydia Franklin, Kathy Franklin, Rhonda Williams and Siata Davis, all of whom claimed to have been passengers in Cimmie Hyman's automobile at the time of the subject accident.
Liberty Mutual conducted an investigation of the defendants' claims, the result of which indicates that Rhonda Williams and Siata Davis were not present in Cimmie Hyman's automobile when the subject accident occurred.
On November 1, 1998, Cimmie Hyman executed an Application for PIP Benefits in which she indicated that she was employed by Delco Battery (a Division of Delphi Automotive Systems) from September 5, 1994 until September 27, 1998, and she had lost approximately $2,000 in wages as a result of the subject accident. In fact, Cimmie Hyman was not employed by Delco Battery on September 27, 1998. Cimmie Hyman's personnel file revealed that she obtained an educational leave from Delco Battery on July 17, 1998.
On October 7, 1998, Siata Davis executed an Affidavit of No Insurance which she submitted to Liberty Mutual stating that she was injured in this accident which occurred on September 27, 1998, and she represented that she was not the registered owner of a motor vehicle on the date of the accident.
On October 23, 1998, Siata Davis executed a second Affidavit of No Insurance in which she again affirmed that she was not the registered owner of a motor vehicle on the date of loss.
On March 19, 1999, Siata Davis provided Robert Doherty of Liberty Mutual with a recorded statement. During the course of the statement, Siata Davis advised Liberty Mutual that she then owned a 1989 Nissan Sentra and that she had owned the vehicle for approximately one year (i.e., March 1998 through March 1999). She further admitted that the vehicle was registered and license plates were on the vehicle on the date of loss. Siata Davis further advised Liberty Mutual that she never insured her 1989 Nissan Sentra.
The individual defendants allegedly treated with Easton for the injuries they allegedly sustained in the subject automobile accident. Liberty Mutual conducted a corporate search of Easton Chiropractic Associates, Inc. and determined that this medical provider was incorporated as a general business corporation. The Certificate of Incorporation for Easton Chiropractic Associates, Inc. revealed that Scott Greenberg, D.C. is the corporation's President, Charles Greenberg is the corporation's Treasurer and Edith Greenberg is the corporation's Vice President and Secretary. Neither Charles Greenberg nor Edith Greenberg are licensed to practice medicine or chiropractic in New Jersey.

II.
The practice structure of Easton is contrary to longstanding jurisprudence in this state, and elsewhere, holding that professional services such as law and medicine may not be practiced in a corporate format, except pursuant to specific, legislative or regulatory exceptions.[1] There is no *897 such legislative or regulatory exception available to Easton to authorize, or legitimize, its practice structure and the services it rendered.
Indeed, if Easton's corporate structure were deemed to be lawful, it will have succeeded in creating a health care practice structure that is capable of extraordinary abuse, yet free of regulatory oversight, regardless of the nature or gravity of the conduct in which a non-licensee owner has previously or may engage.

III.
In 1968, New Jersey adopted the New Jersey Business Corporation Act, N.J.S.A. 14A:1-1 to -9. Under this act, "[a] corporation may be organized ... for any lawful business purpose or purposes except to do in this State any business for which organization is permitted under any other statute of this State unless such statute permits organization under this act." N.J.S.A. 14A:2-1. The foregoing statute makes it clear that in order to lawfully incorporate as a general business corporation, the entity must not be permitted to incorporate under an alternative statute unless the alternative statute permits the entity to also incorporate as a general business corporation.
In 1969, New Jersey adopted the Professional Service Corporation Act, N.J.S.A. 14A:17-1 to -18 (the "Act"), which states that "[i]t is the legislative intent to provide for the incorporation of an individual or group of individuals to render the same professional service to the public for which such individuals are required by law to be licensed or to obtain other legal authorization." N.J.S.A. 14A:17-1. The Legislature specifically defined the term "[p]rofessional service" to mean "any type of personal service to the public which requires as a condition precedent to the rendering of such service the obtaining of a license or other legal authorization...." N.J.S.A. 14A:17-3. The Legislature specifically identified chiropractors as individuals rendering a service coming within the definition of "[p]rofessional service," as defined by the statute. Ibid. Importantly, the Legislature specifically noted that chiropractors could not lawfully render services in the corporate form prior to the passage of the Professional Service Corporation Act. The Legislature stated that "prior to the passage of this act and by reason of law [chiropractic] could not be performed by a corporation." Ibid.
Significantly, the Professional Service Corporation Act does not permit chiropractors to incorporate as a general business corporation. See N.J.S.A. 14A:17-3. In fact, whenever a shareholder of a professional service corporation shall cease to hold his professional license, the shareholder is then required to sever all ties with the professional service corporation and, if he does not do so, the corporation is automatically "converted into ... a [general] business corporation...." See N.J.S.A. 14A:17-11 and -13(b). Accordingly, since the Act does not permit alternative incorporation as, for example, a general business corporation, chiropractors are barred from doing so by N.J.S.A. 14A:2-1.
In Limongelli v. New Jersey State Board of Dentistry, 137 N.J. 317, 645 A.2d 677 (1993), the Supreme Court considered the effect of the revocation of a dentist's license upon the dentist's ability to be a shareholder of a professional service corporation and the ability of a general business corporation to render dental services. The plaintiff, a dentist, was the sole share-holder of two professional service corporations through which he practiced as a dentist. Id. at 322, 645 A.2d 677. On January 9, 1986, plaintiff's license to practice dentistry was revoked. Id. at 321, 645 A.2d 677. Upon the revocation of his license, *898 the plaintiff did not divest himself of his interests in his corporations as required by law. Id. at 322, 645 A.2d 677. The Court noted that, upon the revocation of his license, the plaintiff should have transferred his share in the professional corporations to a duly licensed practitioner within ninety days of the date of disqualification. Id. at 331, 645 A.2d 677. The plaintiff was also required to sever all employment with the corporation and to terminate the receipt of any financial benefits from the corporation. Id. The Court also noted that if the plaintiff was the sole shareholder of a professional service corporation, then the professional service corporation would automatically be converted into a general business corporation. Id. Significantly, the Court noted that a general business corporation cannot engage in the practice of dentistry. Ibid.
In Dalton, Dalton, Little, Inc. v. Mirandi, 412 F.Supp. 1001 (D.C.N.J.1976), the District Court considered whether a contract entered into between a foreign general business corporation and a New Jersey resident was enforceable and whether a general business corporation can engage in the rendering of another type of professional services (architecture). In Dalton, the plaintiff was a general business corporation which was organized under the laws of the State of Maryland. Id. at 1002. The plaintiff entered into a contract with the defendant for the provision of architectural services. Ibid. The District Court noted that in 1969 the New Jersey Legislature passed the Professional Service Corporation Act. Id. at 1003. The court stated that as a result of the passage of the Act:
professionals otherwise forbidden by local law to practice in the corporate form are authorized to incorporate, but only subject to explicit restrictions and requirements designed to assure that the achievement of federal tax equity would not open the way to erosion of the protected relationship between the professional and the lay client, or reduce the level of individual professional responsibility, or provide an escape from disciplinary controls. All of these facets have been designed for the protection of the lay client since time immemorial. Every provision of the professional corporation law ... firmly displays the purpose [of] retaining full control over the professional relationship despite the authority to practice in the corporate form.
[Id. at 1003-04.]
The court further opined that the purpose of the Professional Service Corporation Act was to "protect those with whom professionals deal, and not to allow the professional responsibility to be degraded by allowing use of the corporate form...." Id. at 1006.
After noting that the Professional Service Corporation Act did not allow a foreign corporation to incorporate in New Jersey as a professional service corporation, the court held that the contract entered into between the plaintiff and the defendant was illegal and, therefore, unenforceable. Id. at 1006-07. The court also noted that "[d]omestic business corporations cannot practice architecture in New Jersey; only domestic professional corporations may do so...." Id. at 1007 (citing N.J.S.A. 14A:17-1 to -18).
Furthermore, New Jersey's statutes governing the practice of chiropractic do not anticipate that a general business corporation can engage in the rendering of chiropractic services. More specifically, N.J.S.A. 45:9-14.5 states:
It shall be unlawful for any person, not duly licensed in this State to practice chiropractic, to use terms, titles, words or letters which would designate or imply that he or she is qualified to practice chiropractic, or to hold himself or herself out as being able to practice chiropractic, or offer or attempt to practice chiropractic.
[Ibid.]
New Jersey's health care statutes also proscribe requirements for obtaining a chiropractic license, which can only be obtained *899 by an individual, as opposed to a general business corporation. See N.J.S.A. 45:9-41.4 to -.11. Each of these statutes indicate that an applicant for a chiropractic license must be an individual, not a corporate entity. This distinction is significant in light of the fact that a general business corporation is an entity which is separate and distinct from its shareholders. See Lyon v. Barrett, 89 N.J. 294, 300, 445 A.2d 1153 (1982).
In adopting its practice structure regulations, N.J.A.C. 13:35-6.16, the State Board of Medical Examiners found "insufficient benefit to the public interest to be gained..." from a licensee and non-licensee ownership relationship of a medical facility where the professional work would not be readily subject to regulation by either the Board of Medical Examiners or the State Department of Health under the licensing requirements of the Professional Service Corporation Act, which would otherwise provide the public with some regulatory protections. 24 N.J.R. 629 (Feb. 18, 1992). The Board opined that without licensee ownership, there was no method of assuring honesty and quality in a health care facility unlicensed by any State agency. Id.

IV.
Courts in New Jersey have long recognized that professional services cannot be rendered through a general business corporation since at least the 1933 decision in Unger v. Landlords' Management Corp., 114 N.J. Eq. 68, 168 A. 229 (Ch.1933), where the court held that "since a corporation cannot practice law directly, N.J. Photo Engraving Co. v. Carl Schonert & Sons, Inc., 95 N.J. Eq. 12, 122 A. 307 (Ch.1923), it cannot do so indirectly, by employing lawyers to practice for it." Id. at 72-73, 168 A. 229. The Unger court quoted the New York Court of Appeals in the case of In re Co-operative Law Co., 198 N.Y. 479, 483-84, 92 N.E. 15, 16 (1910), noting that it "bear[s] repeating here for the salutary effect it may have upon similar enterprises in this state." Id. at 73, 168 A. 229. The New York Court of Appeals characterized the attorney/client relationship as involving "the highest trust and confidence[ ]" which "cannot be delegated without consent, and it cannot exist between an attorney employed by a corporation to practice law for it, and a client of the corporation." Ibid.
"These concerns are the basis for the general prohibition of the practice of law by corporations." In re Education Law Center, Inc., 86 N.J. 124, 134, 429 A.2d 1051 (1981). Although there is no reported decision of a New Jersey court extending the rationale of Unger or In re Co-operative Law Co. to the professions of medicine and chiropractic, our courts have recognized that a similarly confidential relationship exists between a physician and his or her patient. "[T]he relationship between a doctor and his patient is of ... a confidential and vital nature...." Lopez v. Swyer, 115 N.J.Super. 237, 251, 279 A.2d 116 (App.Div.1971), aff'd, 62 N.J. 267, 300 A.2d 563 (1973). The New Jersey State Board of Chiropractic Examiners ("Board") has also recognized that a similar relationship of trust and confidence exists between a chiropractor and his or her patient.[2]
Although the Board has never adopted a regulation specifically prohibiting a non-licensee from owning a chiropractic facility, they have been advised by the Attorney General that "practicing medicine [within the format of a business corporation] is not lawful."[3] This was prior to the creation of the Board in 1989, when chiropractors were regulated by the Board of Medical *900 Examiners. See L. 1989, c. 153 (N.J.S.A. 45:9-41.17 to -.25).
The long line of cases holding that health care services may not be rendered through general business corporations has come to be recognized as the "corporate practice of medicine doctrine." The decision of the New Jersey courts in Unger and In re Education Law Center support both of the rationales underlying the corporate practice of medicine doctrine. Moreover, our Supreme Court has recently acknowledged the corporate practice of medicine doctrine and its underlying rationales.
Traditionally the prohibition on the corporate practice of medicine stemmed from a perceived need to protect the public from the commercial exploitation of the practice of medicine. It has been said to be against public policy to permit a `middleman' to intervene for profit in establishing the professional relationship between members of the medical profession and members of the public.
[Dunn v. Praiss, 139 N.J. 564, 568, 656 A.2d 413 (1995) (quoting Michael A. Dowell, The Corporate Practice of Medicine Doctrine Must Go, Health-Span, at 7, Nov. 1994, available in WESTLAW, HealthSpan Database,*4).]
The Supreme Court of South Carolina in Ezell v. Ritholz, 188 S.C. 39, 198 S.E. 419 (1938), reached the same conclusion in the context of general business corporations seeking to provide health care services through licensed employees:
If such a course were sanctioned the logical result would be that corporations and business partnerships might practice law, medicine, dentistry or any other profession by the simple expedient of employing licensed agents.
And if this were permitted professional standards would be practically destroyed, and professions requiring special training would be commercialized, to the public detriment. The ethics of any profession is based upon personal or individual responsibility. One who practices a profession is responsible directly to his patient or his client. Hence he cannot properly act in the practice of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character. State v. Kindy Optical Co., 216 Iowa 1157, 248 N.W. 332; State ex rel. v. Goldman Jewelry Co., 142 Kan. 881, 51 P.2d 995, 102 A.L.R. 334.
[Id. at 424.]
Here, defendant Easton Chiropractic Associates, Inc. was incorporated as a general business corporation on April 2, 1997. In so doing, it indicated that the purpose for which the corporation was organized was to "engage in any activity within the purposes for which corporations may be organized under the New Jersey Business Corporation Act, N.J.S.A. 14A:1-1 et seq." However, general business corporations cannot engage in the practice of medicine and/or chiropractic. Accordingly, the rendering of chiropractic services is both beyond the scope of the activities permitted by Easton's Certificate of Incorporation, as well as the scope of conduct permitted by the laws of the State of New Jersey.
Therefore, Liberty Mutual is entitled to a default judgment against Easton Chiropractic Associates, Inc. declaring that Easton is not entitled to payment for PIP benefits since Easton Chiropractic Associates, Inc. was engaged in the illegal rendering of chiropractic services.

V.
Interestingly, Liberty Mutual's complaint in this matter was filed on October 11, 1999. Easton was served with Liberty Mutual's complaint on November 30, 1999. A default was entered against Easton on March 3, 2000. It appears that in lieu of answering this complaint and contesting the allegations raised therein, Easton Chiropractic Associates, Inc. reincorporated as Easton Chiropractic Associates, P.A. on *901 February 3, 2000. It would therefore appear that, rather than contest Liberty Mutual's suit in the instant matter, Easton Chiropractic Associates, Inc. elected to concede that its bills for services rendered to the individual defendants herein are not entitled to PIP coverage.

VI.
The policy of automobile insurance which Liberty Mutual issued to Cimmie Hyman provides, in pertinent part, that "we do not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy." Since the undisputed evidence demonstrates that Cimmie Hyman submitted to Liberty Mutual a fraudulent claim for income continuation benefits, she is not entitled to PIP and UM benefits. See Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. 530, 582 A.2d 1257 (1990). In Longobardi, the Supreme Court of New Jersey held that an insurance carrier, such as Liberty Mutual Insurance Company, can void an insured's coverage for a loss if the insured knowingly misrepresents a single material fact to the company during the course of its post-loss investigation. Id. at 543-44, 582 A.2d 1257.
The Court found that for an insurer to void a policy because of a post-loss misrepresentation, the misrepresentation must be "knowing and material." Id. at 540, 582 A.2d 1257. Here, Cimmie Hyman's misrepresentation concerning her lost wage claim was clearly material to Liberty Mutual's "concerns and important in determining its course of action[ ]" in deciding whether to honor her claims for insurance benefits. Id. at 542, 582 A.2d 1257. Therefore, Liberty Mutual properly disclaimed coverage to Cimmie Hyman.

VII.
It is undisputed that Siata Davis executed two Affidavits of No Insurance in which she represented to Liberty Mutual that she did not own any automobiles at the time of the subject accident. In contrast, Siata Davis subsequently admitted that these representations were false and that she was the owner of a registered but uninsured automobile at that time.
Individuals who own an uninsured automobile are barred from collecting PIP benefits. See N.J.S.A. 39:6A-7(b). In light of the fact that Siata Davis was the owner of an uninsured automobile at the time of the subject accident, she would also be barred from pursuing any UM claim for her alleged injuries. See N.J.S.A. 39:6A-4.5 and Monroe v. City of Paterson, 318 N.J.Super. 505, 723 A.2d 1266 (App.Div.1999). Siata Davis's ownership of an uninsured automobile at the time of the subject accident is an absolute bar to her entitlement to collect PIP and UM benefits as a result of the subject accident. Therefore, Liberty Mutual is entitled to an order of partial summary judgment voiding her claim to PIP and UM benefits.
NOTES
[1] The Legislature has carved several statutory exceptions from this common law ban against the corporate practice of professional services to permit hospitals, nursing homes and certain other "ambulatory care" facilities to operate as general business corporations. See N.J.S.A. 26:2H-2a; see generally, A. Willcox, Hospitals and the Corporate Practice of Medicine, 45 Cornell L.O. 432, at 466-85. The rationale for this exception is that the adverse influences and countervailing interests peculiar to a business corporation are minimized and overshadowed by their public necessity, by a public need to assure institutional continuity, and by the fact that such entities are regulated and inspected by the State Department of Health and Senior Services, see, e.g. N.J.A.C. 8:43G-1.1 (licensing standards for hospitals), N.J.A.C. 8:43A-1.1 (standards governing "ambulatory care facilities"), N.J.A.C. 8:43C-1.1 (regulations governing public health care centers, health maintenance organizations and rehabilitation facilities), thus providing similar protections otherwise provided by the regulations of the State Board of Medical Examiners, N.J.A.C. 13:35-6.16(f)4, which limit the ability of its licensees to be shareholders or employees of a general business corporation to five settings.
[2] New Jersey State Board of Chiropractic Examiners, Public Session Minutes, February 15, 1996.
[3] November 2, 1983 letter from Bertram P. Goltz, Jr., Deputy Attorney General, to Edwin H. Albano, President, New Jersey State Board of Medical Examiners.