827 A.2d 1188 (2003)
362 N.J. Super. 392
SELECTIVE INSURANCE COMPANY OF AMERICA, Plaintiff,
v.
MEDICAL ALLIANCES, LLC, Prema, LLC, Edward J. Herba, M.D. & Associates, SC, Edward J. Herba, M.D., Neurological Testing Services, LLC, Mitchell E. Rubin, Jose Medica, M.D., Defendants.
Interested Party Defendants, Alliance Medical Group, PC, Anthony Amato, DC, Dr. Michael D. Chillemi, DC, Cross River Mill Chiropractic Center, Dr. Martin Hementz, DC, Dr. John Murphy, DC, Chris Taylor, DC, Total Chiropractic Care Center, Keneth Zammito, DC.
Superior Court of New Jersey, Law Division, Morris County.
Decided January 31, 2003.
*1189 Gordon S. Graber, Morristown and Stephanie Platzman-Diament, for plaintiff (Sullivan and Graber, attorneys).
Shalom Stone, Roseland and K. Roger Plawker, Hoboken, for defendants (Walder, Hayden & Brogan, P.A., attorneys, Roseland).
VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
This opinion supplements the oral opinion of this court rendered on January 8, 2003. This case involves a first verified complaint for declaratory judgment under the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A -1 to -30, seeking, inter alia, treble damages, enjoining arbitration proceedings and requiring discovery. This opinion primarily expounds the issue of the legality of defendants' LLCs, N.J.S.A. 42:2B-21, and their ability to practice medicine in New Jersey.
The preliminary relief that Selective sought with their order to show cause was to obtain an order directing the defendants to respond to plaintiff, Selective Insurance Company of America's discovery requests, which was granted by this court. The primary reason that Selective also sought a stay of arbitrations pending discovery, which the court likewise granted, was that Selective believed that the defendants violated the statutory and regulatory provisions governing the practice of medicine in New Jersey.
The order to show cause required the defendants Mitchell E. Rubin, Edward J. Herba, M.D. and Jose Medina, M.D. to appear for and complete examinations under oath. Herba and Medina are neurologists to whom Medical Alliances, LLC, an Illinois Company, refers insureds for neurodiagnostic examination. It also required defendants to provide fully responsive and certified answers to the plaintiff's first set of interrogatories.
In addition to alleging illegal structures of the medical providers, Selective alleges that defendants are not entitled to personal injury protection ("PIP") benefits because of
(a) unnecessary testing in violation of N.J.A.C. 13:35-2.6(n), N.J.A.C. 13:35-6.17(c)(5), *1190 N.J.S.A. 9:6A-1 et seq., N.J.A.C. 13:35-2.6.
(b) illegal referrals in violation of N.J.S.A. 45:9-22.5, N.J.A.C. 13:35-6.16, N.J.A.C. 35:6.17 and N.J.A.C. 13:35-2.6(r).
(c) the defendants' violation of the prohibition against excessive fees and unbundling in violation of N.J.S.A. 39:6A-1, et seq., N.J.A.C. 11:3-29.4, and N.J.A.C. 13:35-6.17.
(d) the defendants providing treatment and testing in violation of statutes and regulations governing treatment and testing care paths, decision point review and pre-certification. See N.J.A.C. 11:3-4.1, et seq.
Medical Alliances, LLC was formed by Gurnee Holding Company, LLC, on January 13, 2000, under the Illinois Limited Liability Company Act. The name of the company was changed to Prema, LLC on January 2, 2001, while Gurnee Holding Company, LLC was still the "member." Rubin Consulting Group became co-manager (or member). This information was provided by the Secretary of State of Illinois.
Selective alleges that the practice structure of Medical Alliances, LLC, Prema, LLC, and Neurological Testing Services, LLC is contrary to longstanding jurisprudence in this state, and elsewhere, holding that professional services such as law and medicine may not be practiced in a corporate format, except pursuant to specific, legislative or regulatory exceptions.[1]
In 1968, New Jersey adopted the New Jersey Business Corporation Act, N.J.S.A. 14A:1-1 to -9. Under this act, "[a] corporation may be organized ... for any lawful business purpose or purposes except to do in this State any business for which organization is permitted under any other statute of this State unless such statute permits organization under this act." N.J.S.A. 14A:2-1. The foregoing statute makes is clear that in order to lawfully incorporate as a general business corporation, the entity must not be permitted to incorporate under an alternative statute unless the alternative statute permits the entity to also incorporate as a general business corporation.
In 1969, New Jersey adopted The Professional Service Corporation Act, N.J.S.A. 14A:17-1 to 18 (the "Act"), which states that "[i]t is the legislative intent to provide for the incorporation of an individual or group of individuals to render the same professional service to the public for which such individuals are required by law to be licensed or to obtain other legal authorization." N.J.S.A. 14A:17-1. The Legislature defined the term "[p]rofessional service" to mean "any type of personal service *1191 to the public, which requires as a condition precedent to the rendering of such service the obtaining of a license or other legal authorization...." N.J.S.A. 14A:17-3. The Legislature identified chiropractors as individuals rendering a service coming within the definition of "[p]rofessional service," as defined by the statute. Ibid. Importantly, the Legislature specifically noted that chiropractors could not lawfully render services in the corporate form prior to the passage of The Professional Service Corporation Act. The Legislature stated that "prior to the passage of this act and by reason of law [chiropractic] could not be performed by a corporation." Ibid.
The Professional Service Corporation Act states, in essence, that a group of individuals who must be licensed to perform their service must be incorporated as a professional corporation, rather than incorporated as a general business corporation, with certain exceptions. Thus, this Act prohibits chiropractors from incorporating as a general business corporation since they must be licensed by the State to perform chiropractic treatment. See N.J.S.A. 14A:17-3. The Act does not permit alternative incorporation, for example by way of a general business corporation.
Although the present action deals partly with limited liability companies ("LLCs"), rather than general business corporations, the underlying issues are the same. Like a general business corporation, the members of a limited liability company do not have to be licensed professionals nor do they have to obtain and maintain malpractice insurance as physicians do. N.J.S.A. 45:9-19.17a. Members of a professional corporation, on the other hand, all have to be licensed professionals. Unlike a general corporation, or an LLC, a lay person cannot become a member of a professional corporation as The Professional Corporation Act provides that only licensed professionals may hold a shareholder interest in a professional service corporation. See N.J.S.A. 14A:17-10. Thus, unlike a general business corporation or an LLC, if a managing member loses his license to perform chiropractic, he would no longer be permitted by law to control or be a member of the professional service corporation.
In fact, whenever a shareholder of a professional service corporation shall cease to hold his or her professional license, the shareholder is then required to sever all ties with the professional service corporation and, if he does not do so, the corporation is automatically "converted into ... a [general] business corporation...." See N.J.S.A. 14A:17-11 and -13(b). Accordingly, since the Act does not permit alternative incorporation as, for example, a general business corporation, chiropractors are barred from forming a general business corporation even if all members were licensed in New Jersey and complied with various regulations adopted in New Jersey.
Although an exception has been created for attorneys by the New Jersey Supreme Court with regard to LLCs, see R. 1:21-1B,[2] no such exception has been carved out by the Legislature for chiropractors or physicians. The Board of Medical Examiners and Board of Chiropractor Examiners *1192 have never adopted a rule permitting or prohibiting LLCs.
There is nothing in the LLC Act or its legislative history to indicate that, when authorizing LLCs, the Legislature meant to displace existing statutes governing board licensees. In the event that the Legislature were to specifically permit licensed medical personnel or entities to form an LLC, they certainly would prescribe many conditions, such as ownership, as the Supreme Court did with lawyers in adopting R. 1:21-1B. Thus, the only legal way to form a corporation of chiropractors is to form a professional service corporation, as detailed in the statute or possibly an LLC with all members being duly licensed. In addition, if an LLC were permitted to be formed by chiropractors and/or physicians or medical facilities and lay persons, then a lay person could have control over the actions of chiropractors, physicians and medical facilities and reap the financial benefits.
Courts in New Jersey have long recognized that professional services cannot be rendered through a general business corporation since at least the 1933 decision in Unger v. Landlords' Management Corp., 114 N.J.Eq. 68, 168 A. 229 (Ch.1933), where the court held that "since a corporation cannot practice law directly, N.J. Photo Engraving Co. v. Carl Schonert & Sons, Inc., 95 N.J.Eq. 12, 122 A. 307 (Ch. 1923), it cannot do so indirectly, by employing lawyers to practice for it." Id. at 72-73, 122 A. 307. The Unger court quoted the New York Court of Appeals case of In re Co-operative Law Co., 198 N.Y. 479, 483-84, 92 N.E. 15,16 (1910), noting that it "bear[s] repeating here for the salutary effect it may have upon similar enterprises in this state." Id. at 73, 168 A. 229,. The New York Court of Appeals characterized the attorney/client relationship as involving "the highest trust and confidence[ ]" which "cannot be delegated without consent, and it cannot exist between an attorney employed by a corporation to practice law for it and a client of the corporation." Ibid.
These concerns are the basis for the general prohibition of the practice of law by corporations. Although there is no reported decision of a New Jersey court extending the rationale of Unger or In re Co-operative Law Co. to the professions of medicine and chiropractic, our courts have recognized that a similarly confidential relationship exists between a physician and his or her patient. "[T]he relationship between a doctor and his patient is of ... a confidential and vital nature...." Lopez v. Swyer, 115 N.J.Super. 237, 251, 279 A.2d 116 (App.Div.1971), aff'd, 62 N.J. 267, 300 A.2d 563 (1973). The New Jersey State Board of Chiropractic Examiners ("Board") has also recognized that a similar relationship of trust and confidence exists between a chiropractor and his or her patient.[3]
Although the Board has never adopted a regulation specifically prohibiting a non-licensee from owning a chiropractic facility, they have been advised by the Attorney General that "practicing medicine [within the format of a general business corporation] is not lawful."[4] This was prior to the creation of the Board in 1989, when chiropractors were regulated by the State Board of Medical Examiners. See L. 1989, c. 153 (N.J.S.A. 45:9-41.17 to -.25).
The long line of cases holding that health care services may not be rendered *1193 through general business corporations has come to be recognized as the "Corporate Practice of Medicine Doctrine." The decisions of the New Jersey courts in Unger and In re Ed. Law Ctr., Inc., 86 N.J. 124, 429 A.2d 1051 (1981) support the rationale underlying the Corporate Practice of Medicine Doctrine.
In Limongelli v. New Jersey State Bd. of Dentistry, 137 N.J. 317, 645 A.2d 677 (1993), the Supreme Court considered the effect of the revocation of a dentist's license upon the dentist's ability to be a shareholder of a professional service corporation and the ability of a general business corporation to render dental services. The plaintiff, a dentist, was the sole shareholder of two professional service corporations through which he practiced as a dentist. Id. at 322, 645 A.2d 677. On January 9, 1986, plaintiff's license to practice dentistry was revoked. Upon the revocation of his license, the plaintiff did not divest himself of his interests in his corporations as required by law. Id. at 321-22, 645 A.2d 677. The Court noted that, upon the revocation of his license, the plaintiff should have transferred his share in the professional corporations to a duly licensed practitioner within ninety days of the date of disqualification. Id. at 331, 645 A.2d 677. The plaintiff was also required to sever all employment with the corporation and to terminate the receipt of any financial benefits from the corporation. The Court also noted that if the plaintiff was the sole shareholder of a professional service corporation, then the professional service corporation would automatically be converted into a general business corporation. Significantly, the Court recognized that a general business corporation cannot engage in the practice of dentistry. Ibid.
The rationale underlying the Corporate Practice of Medicine Doctrine was discussed in Dunn v. Praiss, 139 N.J. 564, 656 A.2d 413 (1995), where the Court stated:
Traditionally the prohibition on the corporate practice of medicine stemmed from the perceived need to protect the public from the commercial exploitation of the practice of medicine. It has been said to be against public policy to permit a `middleman' to intervene for profit in establishing the professional relationship between members of the medical profession and members of the public.
[Dunn v. Praiss, 139 N.J. 564, 656 A.2d 413 (1995) (quoting Michael A. Dowell, The Corporate Practice of Medicine Doctrine Must Go, Healthspan, at 7, Nov, 1994, available in WESTLAW, HealthSpan Database, *4).]
[Id. at 568, 656 A.2d 413.]
In Dalton, Dalton, Little, Inc. v. Mirandi, 412 F.Supp. 1001 (D.C.N.J. 1976), the District Court considered whether an architectural contract entered into between a foreign general business corporation and a New Jersey resident was enforceable and whether a general business corporation can engage in the rendering of another type of professional services (architecture). In Dalton, the plaintiff was a general business corporation which was organized under the laws of the State of Maryland. Id. at 1002. The plaintiff entered into a contract with the defendant for the provision of architectural services. Ibid. The District Court noted that in 1969 the New Jersey Legislature passed The Professional Service Corporation Act. Id. at 1003. The court stated that as a result of the passage of the Act:
Professionals otherwise forbidden by local law to practice in the corporate form are authorized to incorporate, but only subject to explicit restrictions and requirements designed to assure that the achievement of federal tax equity would *1194 not open the way to erosion of the protected relationship between the professional and the lay client, or reduce the level of individual professional responsibility, or provide an escape from disciplinary controls. All of these facets have been designed for the protection of the lay client since time immemorial. Every provision of the professional corporation law ... firmly displays the purpose [of] retaining full control over the professional relationship despite the authority to practice in the corporate form [Id. at 1004.].
The court further opined that the purpose of The Professional Service Corporation Act was to "protect those with whom professionals deal, and not to allow the professional responsibility to be degraded by allowing use of the corporate form...." Id. at 1006.
After noting that The Professional Service Corporation Act did not allow a foreign corporation to incorporate in New Jersey as a professional service corporation, the court held that the contract entered into between the plaintiff and the defendant was illegal and, therefore, unenforceable. Id. at 1006-07. The court also noted that "[d]omestic business corporations cannot practice architecture in New Jersey; only domestic professional corporations may do so...." Id. at 1007 (citing N.J.S.A. 14A:17-1 to -18).
The Dalton case is relevant because Medical Alliances, LLC is an Illinois company unregulated in New Jersey.
New Jersey's health care statutes prescribe requirements for obtaining a chiropractic license, which can only be obtained by an individual, as opposed to a general business corporation or an LLC. See N.J.S.A. 45:9-41.4 to -11. These statutes indicate that an applicant for a chiropractic license must be an individual, not a corporate entity. This distinction is significant in light of the fact that a general business corporation or an LLC is an entity which is separate and distinct from its shareholders. Lyon v. Barrett, 89 N.J. 294, 300, 445 A.2d 1153 (1982).
In adopting the statute permitting LLCs, the Legislature never considered whether licensed professionals (or lay persons) could form and practice in that capacity.
Selective seeks to determine the ownership of the LLCs to learn if they are truly owned by medical doctors, chiropractors, corporations or lay persons and whether they are actually practicing medicine in New Jersey.
Therefore, whether or not licensed medical professionals or entities can practice as a LLC, be they domestic or foreign, is a matter that can only be determined through discovery.
NOTES
[1] The Legislature has carved several statutory exceptions from this common law ban against the corporate practice of professional services to permit hospitals, nursing homes and certain other "ambulatory care" facilities to operate as general business corporations. See N.J.S.A. 26:2H-2a; see generally, A. Wilcox, Hospitals and the Corporate Practice of Medicine, 45 Cornell L.O. 432, at 466-85. The rationale for this exception is that the adverse influences and countervailing interests peculiar to a business corporation are minimized and overshadowed by their public necessity, by a public need to assure institutional continuity, and by the fact that such entities are regulated and inspected by the State Department of Health and Senior Services, see, e.g. N.J.A.C. 8:43G-1.1 (licensing standards for hospitals), N.J.A.C. 8:43A-1.1 (standards licensing "ambulatory care facilities"), N.J.A.C. 8:43C-1.1 (regulations governing public health centers, health maintenance organizations, ambulatory care facilities and rehabilitation facilities), thus providing similar protections otherwise provided by the regulations of the State Board of Medical Examiners, N.J.A.C. 13:35-6.16(f)(4), which limit the ability of its licensees to be shareholders or employees of a general business corporation to five settings.
[2] Notably, a limited liability company formed for the practice of law must "obtain and maintain in good standing one or more policies of lawyers' professional liability insurance which shall insure the limited liability company against liability imposed upon it by law for damages resulting from any claim made against the limited liability company by its clients arising out of the performance of professional services by attorneys employed by the limited liability company in their capacities as attorneys." R. 1:21-1B(a)(4).
[3] New Jersey State Board of Chiropractic Examiners, Public Session Minutes, February 15, 1996.
[4] November 2, 1983 letter from Bertram P. Goltz, Jr., Deputy Attorney General, to Edwin H. Albano, President, New Jersey State Board of Medical Examiners.