**ISLES WELLNESS, INC., n/k/a Minneapolis Wellness, Inc., et al., Respondents,**

**v.**

**PROGRESSIVE NORTHERN INSURANCE CO., a Delaware corporation doing business in the State of Minnesota, Appellant,**

**Allstate Indemnity Company, a Delaware corporation doing business in the State of Minnesota, Appellant.**

**Nos. A04–485, A04–486, A04–487, A04–488, A04–489.**

Supreme Court of Minnesota.

Sept. 15, 2005.

Richard S. Stempel, Eric S. Hayes, Christopher M. Drake, Stempel & Associates, PLC, Hopkins, MN, for Appellants.

Michael John Weber, Weber Law Office, Minneapolis, MN, for Respondents.

Kay Nord Hunt, Diane M. Odeen, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, MN, for Amicus Curiae Insurance Federation of MN.

David C. Wulff, Roseville, MN, for Amicus Curiae MN Chiropractic Association.

## OPINION

BLATZ, Chief Justice.

The issue in this case is whether the lay ownership of respondents—three clinics[1] providing chiropractic, physical therapy, and massage therapy services (collectively "clinics")—violated the corporate practice of medicine doctrine by providing health care services to patients. The court of appeals held that the corporate employment of chiropractic, physical therapy, and massage therapy practitioners is not prohibited. We affirm in part, and reverse and remand in part, holding that the corporate practice of medicine doctrine applies to the practice of chiropractic, but does not apply to physical therapy or massage therapy.

Jeanette Couf is the sole shareholder of the three clinics at issue in this appeal. The clinics are organized as general business corporations under the Minnesota Business Corporation Act. Minn.Stat. ch. 302A (2004). Couf is not licensed as a chiropractor, physical therapist, or massage therapist.

In March and May 2003, the clinics filed five complaints against appellants Progressive Insurance Co. and Allstate Indemnity Co. (collectively "insurers"), alleging breach of contract and unfair claims practices in connection with unpaid bills for treatment provided to five patients insured by insurers.[2] The insurers answered and counterclaimed alleging that the clinics were formed and operated in violation of the corporate practice of medicine doctrine and seeking damages including payments made to the clinics. The insurers filed a motion for partial summary judgment, arguing that the clinics were not entitled to payment for services provided at the clinics. The district court granted partial summary judgment in favor of the insurers.[3] In granting summary judgment, the district court relied on *Granger v. Adson*,

1. The clinics are: (1) Isles Wellness, Inc., n/k/a Minneapolis Wellness, Inc., (2) MN Licensed Physical Therapists, Inc., n/k/a A Licensed Physical Therapy, Inc., and (3) Licensed Massage Therapists, Inc., n/k/a Twin Cities Licensed Massage Therapy, Inc.

2. The parties agreed that these five cases would represent and resolve all remaining claims between the parties. While the five cases were not formally consolidated at the district court, the district court addressed all five complaints in a single order and memorandum. At the request of the parties, the court of appeals consolidated the cases on appeal.

3. In their counterclaims the insurers also alleged that the clinics violated the Minnesota Professional Firms Act, Minn.Stat. ch. 319B, misrepresented material facts relating to treatment rendered, and illegally solicited patients. At the same time as the district court granted partial summary judgment in favor of the insurers, the district court dismissed the insurers' counterclaims, dismissed the clinics' complaints, and denied the clinics' cross-motion for partial summary judgment.

190 Minn. 23, 250 N.W. 722 (1933), and concluded that because the clinics were practicing "healing" in violation of the corporate practice of medicine doctrine, any contract the clinics had for practicing healing was illegal, against public policy, and void. The district court also concluded that the insurers did not have to pay outstanding bills.

The clinics appealed to the court of appeals. In reversing the district court, the court of appeals held that the corporate employment of chiropractors, physical therapists, and massage therapists did not violate the corporate practice of medicine doctrine. *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 689 N.W.2d 561, 565 (Minn.App.2004). The insurers sought review of the decision of the court of appeals.[4] We granted the insurers' petition for review.

■■■ On review of summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). We view the evidence in the light most favorable to the party against whom summary judgment was granted. *Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005). A motion for summary judgment is granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. Minn. R. Civ. P. 56.03.

Key to the disposition of this case is the vitality and applicability of the corporate practice of medicine doctrine in Minnesota. The insurers argue that summary judgment was properly granted because the corporate practice of medicine doctrine exists in Minnesota and that the clinics' corporate structure violates that doctrine. In contrast, the clinics argue that the corporate practice of medicine doctrine has not been adopted in Minnesota and that, even if it has been adopted, it should not be applied in this case. In order to provide context for these arguments, we first address the origin and history of the doctrine.

Historically, corporations were not permitted to engage in "learned professions" through the employment of licensed professionals except pursuant to specific statutory or regulatory exceptions. 1A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 97 (perm.ed., rev.vol.2002); *see also State v. Bailey Dental Co.*, 211 Iowa 781, 234 N.W. 260, 263 (1931); *Liberty Mut. Ins. Co. v. Hyman*, 334 N.J.Super. 400, 759 A.2d 894, 899 (Law.Div.2000). Cases applying a common law prohibition on corporate practice have addressed health care fields such as medicine, dentistry, optometry, and chiropractic. *See, e.g., People by Kerner v. United Med. Serv., Inc.*, 362 Ill. 442, 200 N.E. 157, 163–64 (1936) (prohibiting the corporate practice of medicine); *Bailey Dental Co.*, 234 N.W. at 263 (prohibiting the corporate practice of dentistry); *Liberty Mut. Ins. Co.*, 759 A.2d at 900 (prohibiting the corporate practice of chiropractic); *Ezell v. Ritholz*, 188 S.C. 39, 198 S.E. 419, 424 (1938) (prohibiting the corporate practice of optometry). This prohibition on corpo-

---

4. The clinics sought cross-review on the issue of whether the insurers should be required to pay the clinics for the outstanding reasonable and necessary medical services provided by the clinics. Because we denied the clinics' request for cross-review and because the court of appeals did not address this issue, we do not address the issue raised by the clinics in their request for conditional cross-review.

rate practice of health care professions is often referred to as the "corporate practice of medicine doctrine." *Liberty Mut. Ins. Co.,* 759 A.2d at 900.

Several states have statutes expressly adopting a prohibition on the corporate practice of medicine. *See, e.g.,* Colo.Rev. Stat. § 12–36–117(m) (2004); *see also* D. Cameron Dobbins, *Survey of State Laws Relating to the Corporate Practice of Medicine,* 9 No. 5 The Health Law. 18 (1997). When adopted by state courts, the general prohibition on corporate employment of licensed health care professionals has been based on a corporation's inability to satisfy the training and licensure requirements set out in state statutes and related public policy considerations.[5] *See, e.g., People by Kerner,* 200 N.E. at 163 ("The legislative intent manifest from a view of the entire [Medical Practice Act] is that only individuals may obtain a license thereunder. No corporation can meet the requirements of the statute essential to the issuance of a license."); *Bailey Dental Co.,* 234 N.W. at 263 ("Inasmuch as a corporation, by its very nature, is incapable of passing an examination for the purpose of a license, and therefore incapable of receiving a license, it cannot lawfully practice dentistry in this state."); *cf. Bartron v. Codington County,* 68 S.D. 309, 2 N.W.2d 337, 342–46 (1942) (prohibiting corporate practice of medicine on a public policy rationale, but concluding that corporate employment of a licensed practitioner does not violate the licensing requirements of the Medical Practice Act). The related public policy considerations underlying the prohibition on corporate practice of a profession in-

clude concerns raised by the specter of lay control over professional judgment, commercial exploitation of health care practice, and the possibility that a health care practitioner's loyalty to a patient and an employer will be in conflict. *See, e.g., Parker v. Bd. of Dental Exam'rs,* 216 Cal. 285, 14 P.2d 67, 72 (1932); *Bartron,* 2 N.W.2d at 342–46.

*State v. Bailey Dental Co.,* an Iowa case, illustrates the policy concerns underlying the corporate practice of medicine doctrine and emphasizes the central role state licensure and education requirements play in the doctrine's rationale. *Bailey Dental Co.,* 234 N.W. at 262. In *Bailey Dental Co.,* the Iowa Supreme Court held that a corporation that employed licensed dentists was engaged in the illegal practice of dentistry. *Id.* at 263. In reaching its conclusion that a corporation could not lawfully practice dentistry through the employment of licensed dentists, the court focused on state licensing statutes and the training required to obtain a license to practice dentistry. *Id.* at 262. Noting a corporation's inability to meet the licensing requirements, the court stated:

> There are certain fields of occupation, which are universally recognized as "learned professions." Proficiency in these occupations requires long years of special study and of special research and training and of learning in the broad field of general education. Without such preparation proficiency in these professions is impossible. The law recognizes them as a part of the public weal and protects them against debasement and encourages the maintenance therein of

---

5. While the dissent cites a commentator for the proposition that as few as five states currently actively apply the doctrine, another commentator asserts that 37 states have statutory or common law prohibitions on the corporate practice of medicine and only 13 states either reject the doctrine or have no authority establishing it. Adam M. Freiman, Comment, *The Abandonment of the Antiquated Corporate Practice of Medicine Doctrine: Injecting a Dose of Efficiency into the Modern Health Care Environment,* 47 Emory L.J. 697, 712–13 (1998).

high standards of education, of ethics and of ideals. It is for this purpose that rigid examinations are required and conducted as preliminary to the granting of a license. The statutes could be completely avoided and rendered nugatory, if one or more persons, who failed to have the requisite learning to pass the examination, might nevertheless incorporate themselves formally into a corporation in whose name they could practice lawfully the profession which was forbidden to them as individuals. A corporation, as such, has neither education, nor skill, nor ethics. These are sine qua non to a learned profession.

\* \* \* \*

Inasmuch as a corporation by its very nature, is incapable of passing an examination for the purpose of a license, \* \* \* it cannot lawfully practice dentistry in this state.

*Id.* at 262–63.

The corporate practice of medicine doctrine has been recognized in many states by judicial opinion or statute,[6] but not all forms of corporate practice are prohibited. For example, the vast majority of states have enacted statutes expressly permitting the formation of professional corporations. *See* Fletcher et al., *supra,* § 112.10 (listing state statutes). In Minnesota, the Professional Firms Act specifically permits the formation of professional corporations to practice certain specified professions, including chiropractic, provided all ownership interests are held by licensed professionals.[7] *See* Minn.Stat. §§ 319B.02, .03, .07 (2004). In addition, Minn.Stat. ch. 62D (2004) permits the formation of Health Maintenance Organizations (HMOs) and

provides that authorized HMOs "shall not be deemed to be practicing a healing art." Minn.Stat. §§ 62D.03, .22, subd. 3. Other common exceptions to the corporate practice of medicine doctrine include hospitals and nonprofit corporations. *See, e.g., People ex rel. State Bd. of Med. Exam'rs v. Pac. Health Corp.,* 12 Cal.2d 156, 82 P.2d 429, 431 (1938) (distinguishing profit and nonprofit corporations for purposes of the corporate practice of medicine doctrine); *Berlin v. Sarah Bush Lincoln Health Ctr.,* 179 Ill.2d 1, 227 Ill.Dec. 769, 688 N.E.2d 106, 111–12 (1997) (exempting hospitals from the corporate practice of medicine doctrine); *see also* Minn. Op. Att'y Gen. No. 92–B–11 (Oct. 5, 1955) (reported in 1956 Report of the Attorney General No. 26 at 88) (stating that a nonprofit corporation may employ physicians and dentists without violating the corporate practice of medicine doctrine).

Our court addressed the prohibition on the corporate practice of health care professions in *Granger v. Adson,* 190 Minn. 23, 250 N.W. 722 (1933), and *Williams v. Mack,* 202 Minn. 402, 278 N.W. 585 (1938). In *Granger,* John Granger, a "layman"— an individual without a health care license—offered a "health audit" to subscribers for a fee. *Granger,* 190 Minn. at 24, 250 N.W. at 722. As part of the health audit, he gave his subscribers four urinalyses and a blood pressure test each year. *Id.* Granger sent the urinalyses to a licensed pathologist for analysis. *Id.* Granger then presented the results obtained from the pathologist to the subscriber and, depending on the results, either advised the subscriber to consult a doctor or offered the subscriber advice

---

6. *See generally* Dobbins, *supra,* at 18.

7. The exception created by the Minnesota Professional Firms Act is not available to Couf, the sole shareholder of the clinics, because she is not licensed in any health care field and thus cannot be an owner of a professional corporation. *See* Minn.Stat. § 319B.07, subd. 1.

about diet, habits, and exercise. *Id.* The licensed pathologist stopped providing Granger with the results of the urinalyses when the State Board of Medical Examiners advised the pathologist that it was illegal for him to do so. *Id.* at 24, 250 N.W. at 722–23. Granger brought an action to enjoin the Board of Medical Examiners from interfering with his contract with the pathologist. *Id.*, 250 N.W. at 722.

On appeal, we held that the contract between Granger and the licensed pathologist was illegal, against public policy, and void. *Id.* at 27, 250 N.W. at 724. We first concluded that Granger was practicing medicine in violation of a Minnesota statute which prohibited the practice of medicine without a license. *Id.* at 25–26, 250 N.W. at 723 (citing 1 Mason's Minn.Stat. 1927 § 5717).[8] Then, comparing the corporate practice of medicine to the corporate practice of law, we stated that it is "improper and contrary to statute and public policy for a corporation or layman to practice medicine" indirectly by hiring a licensed doctor to practice medicine for the benefit or profit of the hirer. *Id.* at 26–27, 250 N.W. at 723 (citing *In re Otterness,* 181 Minn. 254, 232 N.W. 318 (1930)). We further stated: "What the law intends is

that the patient shall be the patient of the licensed physician not of a corporation or layman. The obligations and duties of a physician demand no less. There is no place for a middleman." *Id.* at 27, 250 N.W. at 723.

In addition to our conclusion in *Granger* that Granger was "practicing medicine without a license" and our citation to the licensure statute, we stated that Granger's activities constituted the practice of "healing" as defined by 1 Mason's Minn.Stat. 1927 5705–1.[9] *Granger,* 190 Minn. at 27, 250 N.W. at 723–24. Without elaboration, we simply stated:

> It is so obvious that what the plaintiff does in this regard is practicing healing within the provisions of the statute quoted that it is unnecessary to further discuss that subject.

*Id.*, 250 N.W. at 724. Thus, based on our conclusion that both statutes—the licensing statute and the practice of healing statute—were violated, we held that the contract between Granger and the licensed pathologist "was illegal, against public policy and void." *Id.*

---

**8.** The medical licensure requirements are now set forth in Minn.Stat. ch. 147 (2004).

**9.** The definition of healing is now contained in Minn.Stat. § 146.01 (2004). Consistent with the definition previously codified in section 5705–1, section 146.01 provides:

> The term "practicing healing" or "practice of healing" shall mean and include any person who shall in any manner for any fee, gift, compensation, or reward, or in expectation thereof, engage in, or hold out to the public as being engaged in, the practice of medicine or surgery, the practice of osteopathy, the practice of chiropractic, the practice of any legalized method of healing, or the diagnosis, analysis, treatment, correction, or cure of any disease, injury, defect, deformity, infirmity, ailment, or affliction of human beings, or any condition or condi-

tions incident to pregnancy or childbirth, or examination into the fact, condition, or cause of human health or disease, or who shall, for any fee, gift, compensation, or reward, or in expectation thereof, suggest, recommend, or prescribe any medicine or any form of treatment, correction, or cure thereof; also any person, or persons, individually or collectively, who maintains an office for the reception, examination, diagnosis, or treatment of any person for any disease, injury, defect, deformity, or infirmity of body or mind, or who attaches the title of doctor, physician, surgeon, specialist, M.D., M.B., D.O., D.C., or any other word, abbreviation, or title to the person's name indicating, or designed to indicate, that the person is engaged in the practice of healing.

Five years after *Granger*, we addressed the corporate practice of optometry in *Williams v. Mack*, 202 Minn. 402, 278 N.W. 585 (1938). In *Williams*, a licensed optometrist was employed by a jewelry company that sold eyeglasses at retail. *Id.* at 403–04, 278 N.W. at 586–87. The state Board of Optometry alleged that the jewelry company had violated two of the board's rules relating to advertising. *Id.* A third Board of Optometry rule held optometrists responsible for their employers' violation of the rules. *Id.* at 405, 278 N.W. at 587. The board sought to hold Williams, the licensed optometrist, responsible for his corporate employer's violation of the advertising rules. *Id.* at 403–05, 278 N.W. at 586–87. We rejected the board's position, concluding instead that the statute regulating optometrists made it "impliedly lawful for a licensed optometrist to work for one engaged in the business of selling eyeglasses at retail." [10] *Id.* at 405–06, 278 N.W. at 587–88; *see State v. Goodman*, 206 Minn. 203, 207, 288 N.W. 157, 159 (1939) (reaffirming the interpretation of the statute in *Williams* ).

In reading Minnesota's optometry statute as allowing for corporate employment of optometrists, we relied, in part, on cases from other jurisdictions applying similarly worded statutes. *Williams*, 202 Minn. at 409–10, 278 N.W. at 589. We noted that the other jurisdictions interpreted their statutes to allow corporations "not capable of being licensed to practice optometry, to engage in the business of selling eyeglasses at retail, provided a duly licensed optometrist is placed in charge of and personally attends to the sales." *Id.* Guided by the foreign cases, we concluded that "under our law a duly licensed optometrist may lawfully * * * enter the employment of a company or corporation to supervise and personally attend its business of selling eyeglasses at retail." *Id.* at 410, 278 N.W. at 589. Given the statutory allowance of the corporate employment of optometrists, we held that it seemed "contrary to the letter and spirit of the law to make the employee responsible for the employer's violation of the law." *Id.* at 406, 278 N.W. at 587–88.

Conflicting interpretations of our precedent are central to the parties' dispute here. The insurers posit that *Granger* established the corporate practice of medicine doctrine. In stark contrast, the clinics argue that because we held that the corporate employment of optometrists was permissible in *Williams, Granger* should not be read to include a broad prohibition on the corporate practice of health care professions. The clinics further argue that *Granger* and *Williams* together stand for the proposition that as long as a licensed professional "independently and directly" provides health care services to patients, there is no prohibition on a layperson or corporation employing the professional.

█ In support of their assertion that the corporate practice of medicine doctrine has not been adopted in Minnesota, the clinics point to statutes explicitly prohibiting the corporate practice of veterinary medicine, Minn.Stat. § 156.11 (2004), and dentistry, Minn.Stat. § 150A.11, subd. 1

10. The statute at issue stated:

And it shall be unlawful for any person, not licensed as an optometrist hereunder, to sell or dispose of, at retail, any spectacles, eye glasses or lenses for the correction of vision in any established place of business or elsewhere in this state except under the supervision, direction and authority of a duly licensed optometrist holding a certificate under this Chapter, who shall be in charge of and in personal attendance at the booth, counter or place where such articles are sold or disposed of.

3 Mason's Minn.Stat.1936 Supp. § 5789.

(2004).[11] In the clinics' view, these statutes would be unnecessary if there was already a broad prohibition on the corporate practice of healing. Moreover, the clinics contend that because the statutes pertaining to the therapies involved in the instant case do not similarly include an explicit prohibition on the corporate practice, no such prohibition exists.

■■■■ We disagree with the clinics' arguments. Although we held in *Williams* that the corporate employment of a licensed optometrist was permissible, our holding was based on the conclusion that the *statute* regulating optometrists "implie[d] that it is lawful for a vendor of eyeglass at retail to employ a licensed optometrist to supervise and conduct such sales." *Williams*, 202 Minn. at 406, 409–10, 278 N.W. at 587, 589. Thus, in *Williams* we did not reject the prohibition on the corporate practice of health care professions, but implicitly recognized it, construing the statute as providing an exception to the corporate practice of medicine doctrine for optometrists.[12] Further, we do not believe that the statutes expressly prohibiting the corporate practice

of dentistry or veterinary medicine should be read to be an exception to a general policy allowing the corporate practice of medicine. To begin, veterinary medicine was not implicated by *Granger* because the definition of the practice of "healing" is limited to human health conditions. *See* Minn.Stat. § 146.01. Second, we generally presume that "statutory law is consistent with common law" and that if the statute is intended to abrogate the common law, the abrogation must be "by express wording or necessary implication." *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 377–78 (Minn.1990). There is no abrogation of the corporate practice of medicine doctrine by "express wording or necessary implication." Accordingly, the existence of the statutes does not support the clinics' position that there is no corporate practice of medicine doctrine beyond the statutory prohibitions on the corporate practice of dentistry and veterinary medicine.

In the event that we do not agree with the clinics' interpretation of the law, i.e., that Minnesota has not adopted the corporate practice of medicine doctrine, they argue that the doctrine should be limited

**11.** The clinics and dissent refer to a legislative proposal to prohibit the corporate practice of chiropractic. S.F. 3228, 82d Minn. Leg.2002. This bill was simply introduced and referred to committee. 5 Journal of the Senate 4450 (82d Minn.Leg. Feb. 15, 2002). No action was taken on the bill. *See* Minnesota Senate, Retrieve Senate Bills and Search Bill Status, http://ww2.revisor. leg.state.mn.us:8181 /SEARCH/BASIS/siarch/ public/www/SF (last accessed Aug. 26, 2005) (search for SF3228). While the dissent relies on the lack of action on this bill as evidence that there is no corporate practice of medicine doctrine, the lack of action could have resulted from the recognition that the bill was unnecessary because the common law doctrine already prohibited the corporate practice of chiropractic. Given that it is impossible to accurately speculate as to the meaning that should be ascribed to such inaction, we accord no legal significance to this failure to enact legislation. *See Star*

*Tribune Co. v. Univ. of Minn. Bd. of Regents*, 683 N.W.2d 274, 282 n. 2 (Minn.2004) (stating that given the "myriad reasons and circumstances" for the legislature's failure to enact particular bills, we are "loath to take the leap of attributing specific legislative intent to the legislature's failure to enact particular bills").

**12.** The clinics and the dissent misread *Williams*. Because the court concluded that the statute allowed optometrists to be employed by corporations, the optometrist could not be held liable for the corporation's violation of the board's ethical rules. *Williams*, 202 Minn. at 406, 409–10, 278 N.W. at 587, 589. Had the prohibition on the corporate practice of medicine not existed in our common law, there would have been no issue as to whether the optometrist could be employed by the corporation.

in its application. Specifically, the clinics contend that if the corporate practice of medicine doctrine in fact exists, it does not apply to any of the fields of services at issue here—chiropractic, massage therapy, and physical therapy. Alternatively, the clinics argue that even if the doctrine applies to any of these fields, public policy reasons supporting Minnesota's adoption of the doctrine are no longer viable due to changes in the health care industry.

■ We turn first to the application of the corporate practice of medicine doctrine to the services at issue in this case. The clinics argue that the doctrine is limited to medicine and does not apply to other branches of the healing arts. We do not find this argument persuasive. Our reasoning in *Williams* is built on the foundational principle that the corporate practice of optometry is prohibited unless authorized by statute. *See Williams*, 202 Minn. at 405–07, 278 N.W. at 587–88. This principle belies the clinics' argument that the doctrine is limited to medicine. Further, historically the prohibition on corporate practice applies to the "learned professions" and is not limited to medicine. *See* Fletcher et al., *supra*, § 97. We do agree, nonetheless, with the clinics' argument that the doctrine has limits. In other words, the doctrine does not automatically embrace every form of health care or therapy.

■ A prohibition on the corporate practice of health care arises not simply because particular health care practitioners are engaged in "healing," but also because the individual practitioners are members of a state licensed profession, must undergo significant training and education, and enjoy independent professional judgment. In light of these considerations, we must determine whether massage therapy, physical therapy, and chiropractic fall within the embrace of the corporate practice of medicine doctrine. We note at this juncture that the focus of the parties in this case has been on the *existence* of the corporate practice of medicine doctrine and that the parties have not distinguished the application of the doctrine to the three different health care practices at issue here.

■ We turn first to massage therapy. There is no state licensing requirement for massage therapists. However, massage therapy is recognized as a "complementary and alternative" health care practice. Minn.Stat. § 146A.01, subd. 4 (2004). While we believe that massage therapy rendered pursuant to a doctor's referral falls squarely within the definition of healing, no training or licensure is required by state statute. Thus, much of the underlying rationale of the prohibition on corporate practice is inapplicable. Accordingly, we conclude that the corporate practice of medicine doctrine does not apply to massage therapy.

■ Whether the prohibition on the corporate practice of medicine applies to physical therapists is a more difficult question. No state court decisions have addressed whether physical therapy is included in the corporate practice of medicine doctrine, and opinions issued by state attorneys general are split on the issue. The Tennessee and Maryland Attorneys General have opined that the doctrine does not apply to physical therapy. 85 Md. Op. Att'y Gen. No. 00–022 (Aug. 30, 2000); Tenn. Op. Att'y Gen. No. 94–131 (Nov. 8, 1994). However, the Iowa Attorney General as well as the New York State Board of Physical Therapy have stated that the doctrine prohibits the corporate practice of physical therapy. Iowa Op. Att'y Gen. No. 74–9–4 (Sept. 4, 1974); New York State Education Department, *Corporate Practice of the Professions*

(1998), http://www.op. nysed.gov/corp practice.htm; *see also* Colo.Rev.Stat. § 12–41–124(5) (2004) (prohibiting, with limited exceptions, the corporate practice of physical therapy).

In Minnesota, statutes require that physical therapists undergo training, pass an examination, and maintain a license. Minn.Stat. § 148.70 (2004). Physical therapy is defined by statute as "the evaluation or treatment or both of any person * * * for the purpose of preventing, correcting, or alleviating a physical or mental disability." Minn.Stat. § 148.65, subd. 1 (2004). This statutory definition of physical therapy clearly falls within the definition of healing as set forth in Minn.Stat. § 146.01 because the definition of healing includes those healing practices that involve "the diagnosis, analysis, treatment, correction, or cure of any disease, injury, defect, deformity, infirmity, ailment, or affliction of human beings." Minn.Stat. § 146.01.

While physical therapy constitutes healing, in contrast to medical doctors and chiropractors, physical therapists do not enjoy unfettered independent medical judgment. Statutes pertaining to physical therapy provide that, with the exception of an initial 30–day period, physical therapists may not provide therapy to a patient without an order of referral of a physician, chiropractor, podiatrist, dentist, or advance practice nurse. Minn.Stat. § 148.76, subd. 2(1) (2004); *see also* Minn. R. 5601.1800 (2005). Moreover, if a patient is diagnosed with "an ongoing condition warranting physical therapy treatment," the health care professionals listed above must periodically review the treatment provided by the physical therapist. Minn.Stat. § 148.76, subd. 2(1). Because of these restrictions, the practice of physical therapy—and consequently, the exercise of a

physical therapist's independent judgment—is more limited than the practice of medicine or chiropractic.[13] Thus, the public policy concerns regarding a conflict of interest between the health care provider and the lay person or entity are lessened as the physical therapist is treating under the order of referral or periodic review of other specified health care providers. Accordingly, we conclude that the corporate practice of physical therapy is not prohibited by the corporate practice of medicine doctrine.

■ Next, we turn to the application of the corporate practice of medicine doctrine to the practice of chiropractic. At the outset, we recognize that the public policy considerations supporting the corporate practice of medicine doctrine are applicable to the practice of chiropractic. Chiropractors treat patients directly and are not required to be under the supervision of another licensed health care professional. Therefore, unlike the practice of physical therapy—where referral or supervision are required—the corporate employment of chiropractors implicates the public policy consideration of commercial exploitation. Moreover, corporate practice of chiropractic raises the public policy concerns that corporate employers could interfere with independent medical judgment.

We further note that several Minnesota statutes support a holding that the doctrine includes chiropractic. The practice of chiropractic is expressly included in the definition of healing. Minn.Stat. § 146.01. Statutes also require that chiropractors undergo extensive training, pass an examination, and maintain a license. Minn.Stat. §§ 148.705, 148.71–.72 (2004). In addition, the legislature has specifically recognized chiropractic as a "professional service" for

---

**13.** In addition, physical therapy is not recognized as a "professional service" for purposes of the Minnesota Professional Firms Act. *See* Minn.Stat. § 319B.02, subd. 19.

purposes of the Minnesota Professional Firms Act. Minn.Stat. § 319B.02, subd. 19. We therefore conclude that chiropractic falls into the category of professions that is prohibited from corporate practice except pursuant to specific statutory or regulatory exceptions such as the Professional Firms Act. *See Liberty Mut. Ins. Co. v. Hyman,* 334 N.J.Super. 400, 759 A.2d 894, 900 (Law Div.2000) (prohibiting the corporate practice of chiropractic).

Given our conclusion that chiropractic care falls within the embrace of the corporate practice of medicine doctrine, we address the clinics' alternative and final argument that the public policy reasons once supporting the doctrine no longer exist. In light of the significant changes in the health care industry, the clinics argue that physicians and other health care practitioners are not immune from being motivated by profit and that "today's health-care marketplace places significant fiscal pressures on physicians." In the clinics' view, health care delivery can be more innovative, safer, and more cost-effective when licensed health care practitioners and lay persons unify their efforts. The clinics further argue that the policy concerns underlying the doctrine—division of loyalty, conflict of interest, and the interference with and/or loss of independent, professional judgment—are more appropriately and accurately addressed through licensing laws, which can include requirements such as that health care providers use their independent judgment.

█ We agree with the clinics that some of the policy considerations originally supporting the corporate practice of medicine doctrine need re-examination. We do not agree, however, that the courts are the proper forum to enact such policy change. The legislature is the appropriate branch of government to debate and evaluate the necessity and desirability of alternative forms of health care delivery in this state. In the exercise of judicial restraint, we decline to abruptly change what has long been the rule in Minnesota. *See People ex rel. State Bd. of Med. Exam'rs v. Pac. Health Corp.,* 12 Cal.2d 156, 82 P.2d 429, 431 (1938) (stating that abandonment of the corporate practice of medicine doctrine "should come from the legislature, after the full investigation and debate which legislative organization and methods permit").

█ In summary, we recognize that, with limited exceptions, the corporate practice of medicine doctrine exists in Minnesota and hold that the corporate employment of chiropractors is prohibited except as expressly permitted by statute. *See, e.g.,* Minn.Stat. ch. 62D (2004) (permitting nonprofit HMOs); Minn.Stat. ch. 319B (providing for the formation of professional corporations). Therefore, we reverse the court of appeals and affirm the district court's grant of summary judgment to the extent it relates to the clinics' practice of chiropractic. We further hold that the corporate employment of physical therapists and massage therapists is not prohibited and affirm the court of appeals' reversal of summary judgment to the extent it relates to the clinics' practice of physical therapy and massage therapy. Finally, because the court of appeals did not address the issue and because we denied the clinics' request for cross-review, we do not address the issue of whether the insurers are required to pay outstanding amounts billed for services provided by the clinics. Given our disposition of this case, we remand to the court of appeals to determine this issue.

Affirmed in part, reversed in part, and remanded in part.

HANSON, Justice (concurring in part, dissenting in part).

Although I concur with the majority's conclusions that a general business corpo-

ration may conduct the practices of physical therapy and massage therapy, I respectfully dissent from the majority's conclusion that a general business corporation may not conduct the practice of chiropractic. I would conclude that the regulation of the ownership of a chiropractic practice is not within the inherent power of the court, but is a matter for the legislature, which has not prohibited a general business corporation from conducting such a practice. Further, I would conclude that the so called "corporate practice of medicine doctrine" is not firmly grounded in Minnesota common law. Finally, if we determine that Minnesota common law does recognize that doctrine by court decision, I would overrule it as having been rendered meaningless and unnecessary by the fundamental changes that have occurred in the practice of medicine over recent decades. Accordingly, I would affirm the decision of the court of appeals.

## A. The Role of the Legislature

I agree with the majority's statement that "[t]he legislature is the appropriate branch of government to debate and evaluate the necessity and desirability of alternative forms of health care delivery in this state." But I disagree about what should be the default consequence until the legislature does act. The majority uses judicial restraint to decline to permit the corporate ownership of a chiropractic practice. I would use judicial restraint to decline to prohibit corporate ownership of a chiropractic practice.

Proposals to prohibit the corporate practice of medicine have been around since the turn of the 19th century.[1] But the Minnesota legislature never enacted any prohibitions against the corporate practice of medicine except for veterinary medicine, Minn.Stat. § 156.11 (2004), first enacted in 1937, see Act of March 31, 1937, ch. 119, § 11, 1937 Minn. Laws 189, 192; and dentistry, Minn.Stat. § 150A.11, subd. 1 (2004), first enacted in 1969, see Act of June 5, 1969, ch. 974, § 11, 1969 Minn. Laws 1924, 1935. The legislature has not enacted any prohibition against the corporate practice of chiropractic. To the contrary, on the one known occasion when a bill was presented that would have given the legislature the opportunity to "debate and evaluate the necessity and desirability" of a prohibition against the corporate practice of chiropractic, it was not even given a hearing in committee, and the proposed prohibition was not enacted. S.F. 3228, 82d Minn. Leg.2002.

I agree that some policy considerations can be cited to support a prohibition against the corporate practice of chiropractic, but I find that other policy considerations weigh against any prohibition. The concern of commercial exploitation seems quaint in light of the enormous role the health care industry plays in our national economy, the consolidation of the major portions of that industry into just a few dominant corporations and the annual reports of executive compensation that place health care executives in the top echelons.

---

1. The idea was first introduced in 1890 by a statement of the newly formed American Medical Association (AMA), and by 1912 the AMA had addressed it as an ethical concern in its Principles of Medical Ethics. Thereafter, the AMA pressed for state licensing laws and advocated for judicial recognition of the corporate practice of medicine doctrine. *See* Jeffrey F. Chase–Lubitz, Note, *The Corporate Practice of Medicine Doctrine: An Anachronism in the Modern Health Care Industry,* 40 Vand. L.Rev. 445, 448–52 (1987); Adam M. Freiman, Comment, *The Abandonment of the Antiquated Corporate Practice of Medicine Doctrine: Injecting a Dose of Efficiency into the Modern Health Care Environment,* 47 Emory L.J. 697, 699–703 (1998).

And, the concerns about commercial exploitation and conflicts of interest compete with the perhaps more pressing concerns about inefficiencies that may increase the already high cost of health care and organizational restrictions that may perpetuate the barriers to better public access to health care providers. Because I see no evidence that the legislature has taken a position on these competing concerns one way or the other, I would decline to impose prohibitions where none has been imposed by the legislature.

### B. The State of the Common Law

While I view the inaction of the legislature as evidence that the corporate practice of medicine doctrine does not exist in Minnesota (and should not originate with the court), the majority likely would counter that the legislature's inaction is a form of acquiescence in, or at least a failure to abrogate, the doctrine that existed at common law. One question, thus, is whether the doctrine is truly part of Minnesota common law.

The majority notes that "many states" have recognized the corporate practice of medicine doctrine, by judicial opinion or statute. But the national history of the doctrine is complex. Many states have also rejected the doctrine, and many states that gave recognition to the doctrine in the early 1900s have abandoned it now. *See, e.g.,* D. Cameron Dobbins, *Survey of State Laws Relating to the Corporate Practice of Medicine,* 9 No. 5 The Health Law. 18 (1997). In fact, one commentator reports that "the enforcement of the corporate practice doctrine has slackened over the last 20 years, it is commonly believed that the doctrine is dying a quiet death," and "[a]ccording to one account, the doctrine is actively applied in only five states." Mark A. Hall & Justin G. Vaughn, *The Corporate Practice of Medicine,* in Health Care Corporate Law: Formation and Regulation § 3.2 (Mark A. Hall ed., 1993 and supp.1999). I conclude that it cannot be said that there ever was or now is a commonly accepted corporate practice of medicine doctrine in this country.

In Minnesota, as discussed above, the doctrine has not been established or codified by statute. Further, Minnesota's statutes authorizing the formation of business corporations have not expressly excluded the "learned professions" as a lawful business purpose. In my view, the corporate practice of medicine doctrine also has not been recognized or enforced as part of our common law. The only decision that can be cited as possibly recognizing the doctrine as part of Minnesota's common law is the 1933 decision in *Granger v. Adson,* 190 Minn. 23, 250 N.W. 722 (1933). But, for several reasons, that decision does not fulfill the role claimed for it.

First, and perhaps most important, the facts in *Granger* do not include any corporation. The "person" who employed the physician was an individual, not a corporation. *Id.* at 24, 250 N.W. at 722. Thus, any reference to the corporate practice of medicine in *Granger* is necessarily dicta. Second, the court determined that the individual was not licensed as a physician and was engaging in the unauthorized practice of medicine. *Id.* at 26, 250 N.W. at 723. This resolved the case before the court and all other discussion was gratuitous. Third, the *Granger* opinion does not specifically mention the corporate practice of medicine doctrine or the policies that underlie it. *Granger's* very brief reference to a "corporation" appears to be an aside, not a thoughtful or studied conclusion. Our entire discussion of a corporation is as follows:

> *In Re Disbarment of Otterness,* 181 Minn. 254, 232 N.W. 318, 73 A.L.R. 1319 [1930], we said that a corporation or

layman could not indirectly practice law by hiring a licensed attorney to practice law for others for the benefit or profit of such hirer. We are just as firmly convinced that it is improper and contrary to statute and public policy for a corporation or layman to practice medicine in the same way.

*Granger*, 190 Minn. at 26–27, 250 N.W. at 723. It is unclear from the opinion whether we even considered the corporate practice of medicine doctrine.

The reference to *Otterness*, a 1930 case, was curious because that case involved attorney discipline, a matter clearly within the court's inherent regulatory power over the practice of law. *See, e.g., In re Friedman*, 183 Minn. 350, 353, 236 N.W. 703, 704 (1931) (referencing courts' "inherent authority to admit, discipline, and disbar attorneys"). At issue in *Otterness* was an attorney's employment agreement with a banking corporation to conduct the private practice of law as an employee of and for the benefit of the bank. *In re Otterness*, 181 Minn. 254, 256, 232 N.W. 318, 319 (1930). Although we acknowledged that an attorney may be hired as an employee of a corporation and provide legal services to that corporation, we held that the corporation could not employ an attorney "to conduct law business generally for others" because it "amounted to the unlawful practice of law by the bank." *Id.* at 257, 232 N.W. at 319. But because this court had inherent regulatory power over the practice of law, we had full power to decide, without legislative authorization, whether corporate law practice was compatible with the ethical requirements we imposed on members of the bar. That decision has no application to the corporate practice of the

other professions that are not regulated by this court.

Further, *Williams v. Mack*, 202 Minn. 402, 278 N.W. 585 (1938), provides no support for the doctrine's existence in Minnesota. Because *Williams* interpreted the relevant statute to authorize the corporate practice of optometry, it made no holding under the common law. See id. at 407–09, 278 N.W. at 587.

This court has not considered the corporate practice of medicine doctrine in the 70 years that followed *Granger*. Thus, I would conclude that the doctrine is not recognized in our common law.

### C. The Current Situation

If, contrary to my view, we were to conclude that *Granger* established the doctrine as a part of Minnesota common law, I would not be reluctant to reexamine that doctrine in light of the substantial changes that have occurred since 1933. And, because the doctrine would then be a creature of this court, not the legislature, I would not defer to the legislature, but see it as the court's responsibility to reexamine our own ruling.[2]

As early as 1987, one commentator observed these dramatic changes in the health care industry:

One industry expert predicts that by the mid–1990s, ten national firms will provide fifty percent of the nation's medical care. Nationwide, hospital chains, nonexistent twenty years ago, now own or manage twelve percent of the nation's hospitals. The proliferation of health maintenance organizations, freestanding emergency centers, and other proprie-

---

**2.** We faced a similar question when we were asked to re-examine the common law doctrine of state tort immunity. In rejecting the argument that we should defer to the legislature on that issue, we said: "The doctrine of state tort immunity is a creature of the judiciary and not the legislature, and what we have created, we may abolish." *Nieting v. Blondell*, 306 Minn. 122, 127, 235 N.W.2d 597, 600–01 (1975).

tary health care delivery systems exemplify the increased commercialization of medicine.

Jeffrey F. Chase–Lubitz, Note, *The Corporate Practice of Medicine Doctrine: An Anachronism in the Modern Health Care Industry*, 40 Vand. L.Rev. 445, 446 (1987) (citations omitted).

These trends have continued, causing these observations in 1998:

> The delivery of health care changed tremendously over the eighty years since the AMA first articulated the corporate practice of medicine doctrine. Health care costs in the United States now constitute 14% of the gross national product, translating to over $1 trillion annually. These numbers have been increasing dramatically over the last three decades, from 5.9% of the gross national product and $42 billion each year in 1965 when the Medicare and Medicaid programs were enacted, to 12% of the gross national product and $700 billion annually in 1990, to the current 14% of the gross national product. The causes of these dramatic increases include factors which are inevitable such as the aging of the population, advances in expensive technology and service-cost inflation, and factors which may be susceptible to control, chief among them the long-standing system of third-party payors (insurance carriers) which has kept health care consumers largely insensitive to the price of medical services. It has been estimated that despite the increasing revenues generated by health care generally, as many as half of the acute-care hospitals now in existence will close. Part of this trend has been significant merger and acquisition activity involving hospitals, with one transaction occurring every three days in 1995 and 1996.

Adam M. Freiman, Comment, *The Abandonment of the Antiquated Corporate Practice of Medicine Doctrine: Injecting a Dose of Efficiency Into the Modern Health Care Environment*, 47 Emory L.J. 697, 733–34 (1998) (citations omitted).

Whether as the cause or an effect of these trends, the AMA has lifted its ethical ban on the corporate practice of medicine. In 1975 the Federal Trade Commission (FTC) charged the AMA with antitrust violations, alleging that its Principles of Medical Ethics, including its prohibitions of corporate practice, were anticompetitive because, in part, they restricted arrangements between physicians and nonphysicians and prevented the creation of more economical business structures. See Chase–Lubitz, *supra*, at 475–77; Freiman, *supra*, at 708–712.[3] As a result, the AMA revised its ethical principles to state that "[a] physician shall * * * be free to choose whom to serve, with whom to associate, and the environment in which to provide medical services." American Medical Association, *Principles of Medical Ethics* § VI (1980), *available at* http://www.ama-assn.org/ama1/pub/ upload/mm/369/1980 — principles.pdf.

These changes have fundamentally altered the public policy considerations relied on 70 years ago to support the judicial creation of the corporate practice of medicine doctrine in some states. To the extent that our decision in *Granger* is seen as one of them, I would overrule it.

PAGE, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Hanson.

---

**3.** The FTCs findings were approved with minor modification by the United States Court of Appeals in *American Medical Assn. v. Federal Trade Commission*, 638 F.2d 443, 453 (2d Cir.1980), *affd*, 455 U.S. 676, 102 S.Ct. 1744, 71 L.Ed.2d 546 (1982).

MEYER, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Hanson.